## THE GARLAND.

*(District Court, E. D. Michigan. March 5, 1883)*

1. DECREE OF MARITIME COURT OF ONTARIO.

A decree of the maritime court of Ontario is entitled to the same respect as that of any foreign admiralty or vice-admiralty court.

2. SALE OF VESSEL UNDER DECREE—COLLUSION AND FRAUD.

To invalidate the sale of a vessel under the decree of a court of admiralty on the ground of fraud, it must appear that the proceedings were both collusive and fraudulent, and that the purchaser was cognizant of the fraud. Hence, where a vessel subject to a mortgage, and also to liens for loss of lives, was taken from Detroit to Canada at the instance of her owner for the purpose of freeing her of these liens, and there seized and sold upon a small but valid claim for necessaries, and was bought in for her appraised value by the mortgagee, who had no knowledge that the proceedings had been taken with the approval of the owner, it was *held* that the sale was valid. and the mortgagee took an unincumbered title.

In Admiralty.

This was a libel by an administrator to recover damages for the the death of his intestate, a minor son, occasioned by a collision between the Garland and steamer Mamie, upon the Detroit river, on the twenty-second of July, 1880. The defense by the Detroit River Ferry Company, claimant, was that subsequent to the collision the Garland was sold by a decree of the maritime court of Ontario upon the petition of Odette & Wherry, for coal furnished for the steamer's use. The reply to that defense was that such sale was collusive and fraudulent, and vested no title in the purchaser.

*Jas. Caplis* and *Alfred Russell*, for libelant.

*H. C. Wisner*, for claimant.

BROWN, J. I had occasion to hold, not long since, in the case of *The Trenton*, 4 FED. REP. 657, that the sale of a vessel by the maritime court of Ontario extinguished all prior liens and vested a clear and unincumbered title in the purchaser, notwithstanding such prior liens, contracted in this country, could not be made the foundation of a proceeding *in rem* in the Canadian court. An opinion was intimated that the lienholders in such cases were remitted to the proceeds of the sale in the registry of the court, and that their liens would be respected if valid, according to the *lex loci contractus*. An exception to the validity of such sales was suggested in cases where the proceedings were fraudulent and collusive, if the purchaser at such sale was a party to the fraud. It is claimed by the libelant that this sale was within the exception.

The Garland was built by the Detroit Dry-dock Company and was sold, when the keel was laid, for $22,000 to one Horn, and mortgaged back for $12,500; one-half payable in six months and the remainder in one year, with interest at 10 per cent. The mortgage contained a proviso that if the vessel should be moved beyond the limits of the United States, or be permitted to run in debt to an amount exceeding $500, the dry-dock company might elect to treat the mortgage as due, and take possession of the vessel and sell her, upon 60 days' notice. From January 5, 1880, the date of the mortgage, to July 22d, the dry-dock company received from the earnings of the vessel about $2,000, leaving the interest of the mortgagee upon that day about $10,500.

Upon the evening of July 22d, occurred a collision between the Garland and the little steamer Mamie, in which 17 lives were lost. This collision is claimed to have occurred through the fault of the Garland. Shortly after the collision, one of the directors of the Detroit Dry-dock Company was informed by the libelant's proctor in this case of his intention to file libels in the names of the fathers or administrators of the deceased, and seize the vessel. The director intimated that he would be willing to negotiate the settlement of those claims as soon as the proper parties could be made through the probate court. Before the proper administrators could be appointed in the due course of law, the Garland (which was engaged, partly, at least, as a ferry-boat between Detroit, Michigan, and Windsor, in the province of Ontario) was seized at Windsor, by process from the maritime court, for a coal bill of $36.20, in favor of Odette & Wherry, coal dealers at that place. The bill was only about two months old. The vessel

was duly appraised at the sum of $17,000, proper notices of sale given, and on September 15, 1880, she was sold to the dry-dock company for the sum of $17,050. A bill of sale was duly executed by the marshal of that court and possession given to the purchaser. A large number of persons were present at the sale, and there appears to have been a sharp competition between, at least, two bidders. As the dry-dock company had no power, under its articles of association, to engage in commerce, a new corporation was formed upon the day of the sale, under the name of the Detroit River Ferry Company, to which the dry-dock company made a bill of sale of the vessel.

The record of the maritime court of Ontario, which is in evidence here, shows that on September 7th, two days before the order of sale was made, Cuddy, the libelant in this case, and eleven others, filed their petitions against the steamer for substantially the same causes of action as are set up in these cases; that about the same time there were other petitions for necessaries filed in the same court, amounting in the aggregate to about $4,300. The record also shows that the dry-dock company filed a petition against the steamer for the protection of its interest as mortgagee.

Upon the trial of a test case resembling Cuddy's, except in the fact that plaintiff did not sue in the capacity of administrator for the value of his son's services, the petitioner was defeated and appealed to the supreme court, which affirmed the judgment of the maritime court, both courts intimating to him that if he had appeared in the capacity of an administrator, instead of a father, suing for the services of his minor child, he might have recovered under Lord CAMPBELL's act, which has been substantially re-enacted in Canada.*

Libelant seeks by this proceeding to have the sale made by the maritime court declared null and void, and the vessel subjected to his lien for damages occasioned by the collision. To prove his case he called the president and secretary of the dry-dock company, who swore they had no knowledge of the vessel being taken to Canada for the purpose of sale. The testimony of the president of the dry-dock company, a gentleman of the highest integrity, indicates that he had no knowledge at whose suit the Garland was sold, but merely went to Windsor to protect the interests of the dry-dock company, by seeing that she was not sold for less than her appraised value. The testimony of the secretary shows very clearly that he kept watch of the vessel in the interests of the dry-dock company, and of the pro-

---

*See *The E. B. Ward, Jr.*, *ante*, 255.

ceedings against her in Canada, and that he consulted with his attorneys as to the *status* of the mortgage in case the vessel should be sold. He is also shown to have settled with the owners of the Mamie for the amount of damage done that vessel, upon the basis of fault upon both sides, and this too after the sale of the Garland. While it is difficult to believe that the seizure of this large steamer by Odette & Wherry, for a small coal bill of $36.20, was their uninspired act, the entire testimony is consistent with the theory that Horn, who owned the steamer, might have taken her over there himself, and had her sold for the purpose of freeing her of these liens.

The testimony rather repels than supports the inference that this was done at the instigation of the mortgagee. That she was taken to Canada and libeled, rather than be seized at Detroit, is explicable upon the theory that the district judge of this district was absent at the time, and that there was no one here to appoint appraisers and supervise the bonding of the vessel. That these proceedings were collusive, so far as the owners were concerned, may be easily believed; but, unless I am to give credence to a theory exactly opposite to the testimony of the president and secretary of the dry-dock company, it is impossible to believe that they were parties to the collusive arrangement.

But admitting, for the sake of this argument, that these proceedings were taken with the knowledge and procurement of the dry-dock company, (and it is clear that if they had desired to stop these proceedings they could have paid the bills and released the vessel,) it must be shown, in order to invalidate this claim, that the suit was fraudulent as well as collusive. In all the cases wherein it has been held that third persons could attack a judgment collaterally for fraud, it has appeared that the judgment itself was such an one as ought not to have been rendered upon the facts of the case.

Thus, in *Parkhurst* v. *Sumner*, 23 Vt. 538, a leading case upon this point, which was an action against the surety upon a recognizance, it was held to be a good plea that a judgment had been rendered in favor of the plaintiff against the principal upon the bond for the purpose of defrauding the surety, and after the debt between the original parties had been paid and satisfied.

So, in *Annett* v. *Terry*, 35 N. Y. 256, the sureties on an administrator's bond, who were sued upon a judgment against the administrator, were held entitled to show that the judgment was collusive, and was rendered for a much larger amount than could possibly have

been recovered if it had been contested in good faith. Like rulings in principle were also made in the following cases: *Dougherty's Estate*, 9 Watts & S. 189; *Thompson's Appeal*, 37 Pa. St. 175; *Willard* v. *Whitney*, 49 Me. 235; *Pierce* v. *Jackson*, 6 Mass. 242; *Great Falls Manuf'g Co.* v. *Worster*, 45 N. H. 110; *Berger* v. *Williams*, 4 McLean, 577; *Feaster* v. *Woodfill*, 23 Ind. 493.

In all these cases it appeared not only that the judgment was collusive, but that the debt against the principal, upon which the judgment was rendered, either did not exist at all or was grossly exaggerated, for the purpose of defrauding the surety.

Now, there is no evidence in this case tending to show that the bill of Odette & Wherry was not an honest one; that the Garland was not lawfully indebted to the dry-dock company in the sum recovered; that the vessel was not within the jurisdiction of the court; that the decree was not properly entered; that the president of the dry-dock company, Mr. Owen, did not purchase her for more than her appraised value, and pay the money in court; and that the Detroit River Ferry Company was not organized in good faith to run this vessel, because the dry-dock company could not, under its articles of association, engage in navigation. The fraud, if any there was, consisted solely in the fact that these proceedings were taken for the purpose of freeing this vessel from the claims of the libelant and others in a like position. But all they could do in this connection, and all they attempted, was to transfer these liens from the vessel itself to the proceeds of her sale. Libelant lost no right by such proceeding. He might still pursue the proceeds of the sale, and assert his lien in the maritime court. In fact, he did file a petition for that purpose, and was only defeated, as shown by the report of the case, because, in the opinion of the court, he should have filed his petition as the administrator of his minor son, and not as a father seeking to recover for the loss of his son's service. If the steamer had remained in Detroit he would undoubtedly have seized her here, and the same proceeding would have been had, possibly with a different result, although even that is open to grave doubt. She would have still been appraised and sold, and the contest would have taken place over her proceeds, as it did in the Canadian court. Perhaps this court might have entertained his libel, and proceeded to adjudicate upon the merits of the collision; but the fact that, in a proceeding to sell a vessel and distribute its proceeds, the maritime court of Ontario proceeds upon a slightly different theory from our own, is, as was said in the

case of *The Trenton*, not the slightest reason for holding the sale to be invalid. The libelant and the other parties interested in the proceeds of this sale have not only had full opportunity to be heard, but have been heard, and it is their misfortune that their claims were not entertained. That the material-men and the mortgagee were preferred to them in the distribution of the proceeds is a mere accident of the law, and tends in no way to disturb the jurisdiction of the court in adjudicating the sale.

In *Castrique* v. *Imrie*, L. R. 4 H. L. 427, the court went much further than we are called upon to go in this case, and held that if a foreign court, having jurisdiction, fairly and honestly came to a conclusion, its judgment could not be impeached in England on the ground of mistake in the law. In that case the mortgagee, through the misapprehension of a French court as to English law, lost his security, and was held to have had no standing in court.

The case under consideration is not, in its principles, unlike those wherein a party takes up his residence in another state for the express purpose of bringing suit in the federal court. The law is entirely settled that if such domicile be *bona fide* he may sue, notwithstanding his purpose was to resort to a jurisdiction of which he could not have availed himself if he were a resident of the state in which the court was held. *Briggs* v. *French*, 2 Sumn. 251; *Catlett* v. *Pacific Ins. Co.* 1 Paine, 594; *Cooper* v. *Galbraith*, 3 Wash. 546; *Johnson* v. *Monell*, Woolw. 390.

So, in this case, if the sale be *bona fide*, a good title passes, notwithstanding the purchaser was cognizant of a purpose to have the vessel sold to free her from liens.

The libel must be dismissed, with costs.