### LOUD et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. January 9, 1923.)

Nos. 3641, 3642.

1. **Navigable waters ⬅2—Delegated authority to determine what constitutes obstruction cannot be arbitrarily exercised.**

As an incident to its power to regulate navigation, Congress can determine what constitutes a menace or obstruction to navigation, and has delegated its authority to make such determination to the Secretary of War by Rivers and Harbors Act March 3, 1899, § 20 (Comp. St. § 9925), but such power cannot be exercised arbitrarily by the Secretary of War or the engineer officer in charge under him.

2. **Navigable waters ⬅24—Owner of vessel obstructing navigation is not personally liable for cost of removal.**

Rivers and Harbors Act March 3, 1899, § 20 (Comp. St. § 9925), authorizing the Secretary of War or any agent to remove a sunken vessel which is an obstruction to navigation, and to sell the vessel and cargo, or any part thereof, to reimburse the United States for the expense of such removal, does not make the owner of the vessel personally liable for the expense of removal.

3. **Navigable waters ⬅24—Work on vessel obstructing navigation was not for benefit of owner, when vessel subsequently proved total loss.**

The United States cannot recover from the owner personally, its expenditures for work on a sunken vessel, which was an obstruction to navigation, on the theory that such work was for the benefit of the owners, where the vessel proved to be a total loss to the owners.

4. **Maritime liens ⬅40—Agreement with insurers held not to obligate owners to pay liens.**

Where the owners of a sunken vessel entered into a compromise agreement with the underwriters to protect the insurance companies from further payment on account of liens on the vessel, the agreement did not affect the status of the lien of either the government or the wrecking company for work on the vessel, nor obligate the owners personally to

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

pay either lien, unless such payment was required for the protection of the insurance companies.

**5. Admiralty ☞101—Decree disposing of proceeds of sale is binding on lien claimants.**

A decree of a court of admiralty having jurisdiction of the subject-matter by seizure and sale of the vessel, which disposes of the proceeds of the sale, is binding on every person claiming any right or title to the vessel.

**6. Admiralty ☞101—Payment of surplus to owner held to have been made on account of advancements to lien claimant.**

Where one of the owners of a sunken vessel advanced, on behalf of the wrecking company which had contracted to raise the vessel, the freight for the transportation of the cargo to its destination, a decree reimbursing the owner for that advancement out of the proceeds of the sale of the vessel was not equivalent to a payment to the owner as owner of the surplus proceeds of the sale, so as to entitle the United States to enforce against such payment its lien on the vessel for work in removing it as a menace to navigation.

**7. Courts ☞526½, New, vol. 17A Key-No. Series—Decree of admiralty court not reviewable by another admiralty court.**

A decree of one admiralty court of competent jurisdiction, which had acquired jurisdiction over a vessel by seizure and sale, which disposed of the proceeds of the sale, cannot be reviewed by another court of admiralty.

In Error to the District Court of the United States for the Northern Division of the Eastern District of Michigan; Clarence W. Sessions, Judge.

Action at law by the United States against Henry N. Loud and others to recover the amount expended in straightening a sunken vessel in a navigable channel. Judgment for plaintiff for only the amount received by defendants from the sale of the vessel, and defendants bring error; the United States assigning cross-error. Judgment reversed, in so far as it awarded the plaintiff any recovery, and remanded, with directions.

On May 21, 1910, at about 2:30 a. m., the steam barge John B. Ketcham II, jointly owned and operated by Henry N. Loud. George A. Loud, and Edward F. Loud, en route from Brimley, Mich., to Tonawanda, N. Y., carrying a cargo of pulpwood, collided with the abutment or crib at the upper entrance of West Neebish channel, St. Mary's river, swung to midchannel, and sank in 21 feet of water. In the opinion of the United States engineer officer in charge, who was duly authorized by the Secretary of War to act in the premises, this sunken vessel presented such a menace to navigation as to constitute an emergency, within the meaning of Section 20 of the Act of March 3, 1899 (Comp. St. § 9925). Thereupon the Department of War, proceeding under the authority conferred by that section, cleared the channel from this obstruction and menace to navigation by straightening the sunken vessel in the channel at an expense to the United States government of $18,459.

The Louds were then notified orally and in writing that, if it was not practical for the owners to pay this expense, the same would be "charged against the vessel." The owners did not pay, and the government did not proceed to sell this vessel and cargo or any part thereof, but, on the contrary, surrendered possession to the owners. Thereafter the insurance companies that had written insurance on this vessel and cargo took possession and through their agents entered into a contract with the Reid Wrecking Company to raise the Ketcham and cargo and deliver them at Tonawanda, N. Y., for $12,000. or 50 per cent. of the salved value, at the underwriter's option. "No cure, no pay." The Reid Wrecking Company in pursuance of this con-

tract raised the vessel and attempted to transport it to Tonawanda, N. Y., but by reason of its damaged condition it could not then be taken further than Port Huron, Mich. The Reid Company then chartered a vessel to take the cargo of pulpwood to Tonawanda, and at its request Henry N. Loud, one of the joint owners, hired and paid longshoremen, superintended the transfer of the cargo from the hold of the Ketcham to the chartered ship, and, upon the promise and agreement of the Reid Wrecking Company to repay the same, advanced the money necessary to pay the charges for transshipment of the cargo to Tonawanda, amounting to $1,842.00. This sum of money, and no part thereof was ever repaid to the Louds by the Wrecking Company.

Later the Reid Wrecking Company transported the Ketcham to Sarnia, Ontario, and on the 6th day of December, 1910, filed a libel against it in the Exchequer Court of Canada, Toronto Admiralty District, to enforce a lien for the full $12,000 contract price for raising the vessel and cargo and transporting it to Tonawanda, N. Y. Process was duly issued and served as required in admiralty cases, and the Ketcham II was sold prior to the adjudication of liens for $12,650. The Louds appeared and litigated the claim of the Reid Wrecking Company. The United States did not enter an appearance to this action, nor did it then, or at any other time, make any attempt to enforce a lien either against the vessel, its proceeds or its cargo. A decree was entered in the libel suit by the Exchequer Court of Canada in favor of the Reid Wrecking Company for the full amount of its claim, less $1,842 paid by the Louds for the transshipment of the cargo from Port Huron to Tonawanda. The court further found that the Reid Wrecking Company's claim was the first and best lien on the proceeds of the sale of the vessel, which fund was then in the custody and control of the court, and ordered and directed that out of such proceeds there should be paid to the Reid Wrecking Company the sum of $10,158, to Henry N. Loud the residue of said fund, amounting, with interest, to $1,468.87, and distribution of the proceeds of the sale of the Ketcham II was made accordingly.

On September 1, 1913, the United States brought an action in the District Court for the Eastern District of Michigan, Northern Division, against Henry N. Loud, George A. Loud, and Edward F. Loud to recover from them as owners, the amount of money expended by it in straightening the sunken vessel, John B. Ketcham II, in the West Neebish channel. Upon the trial of the issue joined by the declaration, the amendment to the declaration and the answer of the defendants the district court directed a verdict for the plaintiff for the sum of $2,111.47, being the amount of money paid to Henry N. Loud upon the order of the Canadian court out of the proceeds of the sale of the vessel after payment of the lien of the Reid Wrecking Company, with interest on that amount from that date. On this verdict judgment was rendered in favor of the United States and against the Louds, who now prosecute error proceedings No. 3641 to reverse that judgment. Cause No. 3642 is a cross-writ of error by the United States to reverse the judgment of the District Court overruling its motion for a directed verdict for the full amount of its claim.

Harry Helfman, of Detroit, Mich. (Lucking, Helfman, Lucking & Hanlon, of Detroit, Mich., on the brief), for plaintiffs in error.

Frederic L. Eaton, Asst. U. S. Atty., of Detroit, Mich. (Earl J. Davis, U. S. Atty., of Detroit, Mich., on the brief), for the United States.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge (after stating the facts as above). Section 20 of the Rivers and Harbors Act, approved March 3, 1899, provides, among other things:

"That under emergency, in the case of any vessel, boat, water craft, or raft, or other similar obstruction, sinking or grounding, or being unnecessarily de-

layed in any government canal or lock, or in any navigable water mentioned in section nineteen, in such manner as to stop, seriously interfere with, or specially endanger navigation, in the opinion of the Secretary of War, or any agent of the United States to whom the Secretary may delegate proper authority, the Secretary of War or any such agent shall have the right to take immediate possession of such boat * * * so far as to remove or to destroy it and to clear immediately the channel * * * that the expense of removing any such obstruction as aforesaid shall be a charge against such craft and cargo; and if the owners thereof fail or refuse to reimburse the United States for such expense within thirty days after notification, then the officer or agent aforesaid may sell the craft or cargo, or any part thereof that may not have been destroyed in removal, and the proceeds of such sale shall be covered into the Treasury of the United States."

[1] The Constitution of the United States confers authority upon Congress to regulate navigation. Incident to that power Congress has the right to determine what constitutes a menace or obstruction to navigation. It is the purpose and intent of section 20 of the Rivers and Harbors Act of March, 1899, that this decision of the Secretary of War shall have the same force and effect as direct action by Congress itself. Such power, of course, cannot be exercised arbitrarily or beyond constitutional limitations, but in this case there is neither averment nor proof that either the Secretary of War or the engineer officer in charge abused the discretion conferred upon him by this section. Monongahela Bridge Co. v. United States, 216 U. S. 177, 195, 30 Sup. Ct. 356, 54 L. Ed. 435; Union Bridge Co. v. United States, 204 U. S. 365, 27 Sup. Ct. 367, 51 L. Ed. 523; Southern Pacific Co. et al. v. Olympian Dredging Co., 43 Sup. Ct. 26, 67 L. Ed. ——, decided by the Supreme Court of the United States November 13, 1922.

[2, 3] It is equally clear that the owner of a vessel is not personally liable for the expense incurred by the government in removing obstructions to navigation under authority of this section, but, on the contrary, that the claim for such expenses must be asserted directly against the vessel and its cargo. The further claim of the United States government that, notwithstanding it did no more than straighten this vessel in the channel, still leaving it resting on the bottom, this money was expended for the use and benefit of the owners, even if tenable under other facts and circumstances of this case, is negatived by the uncontradicted evidence that this vessel was a total loss, and that the owners did not receive out of the vessel or its proceeds even as much as they advanced at the request of the Reid Wrecking Company in an effort to salvage the cargo.

[4] Nor did the expenditure of this money inure to the benefit of the owners of the vessel by reason of any money paid to them by the insurance companies or by reason of any settlement agreement made with such companies. It appears from the evidence that the owners first concluded that the vessel was a total loss and surrendered it to the insurance companies. Later they reached the conclusion that the value of the damaged vessel was still in excess of the liens of the United States and the Reid Wrecking Company, and so believing entered into a compromise agreement with the underwriters, by the terms of which they agreed to protect the insurance companies from further

payment on account of either of these liens. This agreement in no way changed or affected the status of these 'liens, nor did it obligate the Louds to pay either of them, unless such payment was required for the protection of the insurance companies with whom this compromise agreement was made.

For the reasons above stated the judgment, in so far as it is challenged by the cross-writ of error, is affirmed.

[5] It is wholly unnecessary to determine the character of the lien of the United States for the money expended by it in straightening this vessel in the channel, or whether or not such lien survived the unconditional surrender of possession of the vessel and cargo to its owners. The fact remains that the United States wholly failed and neglected to assert that lien, when required to do so, in a court having jurisdiction of the vessel and its proceeds.

The familiar principle that all the parties to a suit are bound by the decree of a court having jurisdiction of the subject-matter in controversy has its widest application in cases of admiralty suits of this character and other proceedings in rem. Every person claiming any right or title is charged with constructive notice of its seizure by a court of admiralty when notice is properly served upon the vessel itself. The decree therefore binds the world in so far as it disposes of the vessel or its proceeds. Penhallow et al. v. Doanes' Adm'r, 3 U. S. (3 Dall.) 54, 85, Fed. Cas. No. 10,925; The Mary, 13 U. S. (2 Wheat.) 125, 143, 4 L. Ed. 200; The James G. Swan (D. C.) 106 Fed. 94; The Garland (D. C.) 16 Fed. 283; Benedict's Admiralty (4th Ed.) § 297. The effect of a decree in admiralty is well stated in an opinion by Attorney General Wickersham in relation to the transaction here involved in this language:

"It seems to be the well-settled rule of admiralty that a decree of any of its courts binds all the world, and that 'whatever the court settles as to the right or title, or whatever disposition it makes of the property by sale, revendication, transfer, or other act will be held valid in every other country where the same question comes directly or indirectly in judgment before any other foreign tribunal.'" Steamer John B. Ketcham No. 2, 29 Op. Atty. Gen. 276.

[6] It is said, however, that because the residue of the proceeds of the sale of this vessel, after paying the claim of the Reid Wrecking Company, was paid to the owners that the United States now has the right to assert its claim and lien to that extent against the owners, but in the opinion of a majority of this court the decree entered by the Exchequer Court of Canada in the libel suit disposed of the entire proceeds of the sale of the vessel upon an entirely different theory than ownership.

While it appears from the evidence in this case that the cost of transshipment was paid by the Louds at the instance and request of the Reid Wrecking Company, and upon its promise and agreement to repay the same, nevertheless, we are not advised of the evidence introduced upon that subject in the libel action. In that action a court of competent jurisdiction awarded the surplus to Henry N. Loud, and not to the owners, evidently upon the theory that Henry N. Loud had advanced this money to enable the Reid Wrecking Company to comply

with its contract, and for that reason, in the opinion of that court, he was personally entitled to be subrogated to that extent to its lien upon the vessel and its proceeds.

[7] The question of whether this was or was not a proper award is no longer open to inquiry. This court has no power or authority to review or reverse that decree, but it must be given full force and effect in each and all of its parts. The order distributing the proceeds of the sale of a libel vessel to the different claimants of the fund discharges the fund so distributed from all liens against the vessel that attached to the proceeds after its sale. The J. W. Tucker (D. C.) 20 Fed. 129, 135; The City of Tawas (D. C.) 3 Fed. 170.

This case, therefore, does not present the question whether surplus funds paid to the owner in a libel suit out of the proceeds of the sale of a vessel after the liens adjudicated have been paid in full may be recovered from the owner by one claiming a lien that was not presented and adjudicated in the libel suit, but, on the contrary, whether the maritime court in the libel action erred in the adjudication of the claims presented and the distribution of the fund among the several claimants. This court has no jurisdiction to decide this question.

A majority of the court is of opinion that the judgment should be reversed, so far as it awards to the United States the surplus of $2,111.40 received by Henry N. Loud out of the proceeds of the sale of the vessel, after payment of the lien of the Reid Wrecking Company.

The judgment of the District Court is reversed, and cause remanded, with directions to enter judgment in conformity with this opinion.