UNITED STATES of America,
Appellant,

v.

CARGILL, INC., et al., Appellees.

UNITED STATES of America,
Appellant,

v.

2,220,000 POUNDS CHLORINE Cargo ex
BARGE WYCHEM 112 and Containers
in Rem and Union Carbide Corp., et al.,
in Personam, Appellees.

No. 22148.

United States Court of Appeals
Fifth Circuit.

July 13, 1966.

Rehearing Denied Sept. 12, 1966.

Martin Jacobs, Alan S. Rosenthal, Attys., Dept. of Justice, Washington, D. C., John W. Douglas, Asst. Atty. Gen., Louis C. Lacour, U. S. Atty., for appellant.

Lucian Y. Ray, Cleveland, Ohio, Benjamin Yancey, Alfred M. Farrell, Jr., New Orleans, La., William D. Carle,

Cleveland, Ohio, McCreary, Hinslea & Ray, Cleveland, Ohio, and Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., of counsel, for appellee, Wyandotte Transportation Co.

George B. Matthews, Lemle & Kelleher, George A. Frilot, III, New Orleans, La., for Union Barge Line Corp.

Tom F. Phillips, Baton Rouge, La., J. Barbee Winston, New Orleans, La., Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, La., Phelps, Dunbar, Marks, Claverie & Sims, Gerard T. Gelpi, New Orleans, La., of counsel, for appellees Cargill, Inc., Cargo Carriers, Inc., Inland Rivers Transportation Co., Jeffersonville Boat and Machine Co., Continental Ins. Co., and Travelers Ins. Co.

Robert B. Acomb, Jr., George Denegre, John R. Peters, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Union Carbide Corp.

Before RIVES and GEWIN, Circuit Judges, and ALLGOOD, District Judge.

GEWIN, Circuit Judge:

This is an appeal from the judgment of the United States District Court for the Eastern District of Louisiana in two admiralty cases involving the question of whether one, who by his alleged acts of negligence causes a vessel to sink and obstruct navigation in inland waterways, may abandon the vessel without incurring liability for either its removal or cost of removal. The cases were consolidated[1] by the District Court for disposition of the motions for summary judgment filed by all defendants in both cases pursuant to Rule 58(b) of the Supreme Court Admiralty Rules. The motions for summary judgment were granted and the suits dismissed.

In United States v. Cargill, two barges, M 65, owned by Jeffersonville Boat and Machine Corp., and L 1, owned by Cargo Carriers, Inc., were moored by a tug at the Cargill fleet mooring at Jackson's Landing, Mile 227.5 above Head of Passes, Baton Rouge, Louisiana, on March 30, 1961. At approximately 3:32 A.M. on March 31, 1961, the supertanker Esso Zurich bound upriver for Baton Rouge collided with and sunk an unmanned and unlighted barge, which was drifting in the channel. The incident was reported by radio to the barge fleet at Baton Rouge and the two barges, M 65 and L 1, were discovered missing. Although only one barge, believed to be the L 1, was located and showed marks of a collision, both barges, L 1 and M 65, were reported by Cargo Carriers, Inc. as sunk. Cargo Carriers, Inc. then marked the barges for day and night navigation. On April 9, 20, and 26, 1962, Inland Rivers Transportation Co. and Cargo Carriers, Inc. wired the District Engineers that they had abandoned the Barges, L 1 and M 65, and considered the Government the owner of the vessels. The United States by return wires refused to accept abandonment and responsibility for marking and removing the wrecks. The United States then brought suit against the owners, managers and charterers of the barges alleging negligence in the condition and mooring of the barges, to have the defendants decreed the owners of the wrecked barges and liable for their removal.

The facts in the second case, United States v. Wychem, are somewhat more dramatic. On March 15–17, 1961, the tanks of the barge, Wychem 112, a liquid chlorine barge, were each filled at Geismar, Louisiana, with 555,000 pounds of chlorine gas to be delivered to Union

---

1. In the case of United States v. Cargill, et al., involving sunken barges L 1 and M 65 the parties defendant are the owners, managers, charterers, and insurers. These barges have not been removed. In the case of United States v. Wyandotte Transportation Co., et al., involving the barge Wychem 112 the parties defendant are the owner of the chlorine cargo, Union Carbide Corporation; the owner of the Wychem 112, Wyandotte Transportation Co.; and the owner of the tugboat which was moving the Wychem 112, Union Barge Line Corporation. The chlorine tanks on the Wychem had been removed from the water when the litigation commenced.

Carbide Corporation at South Charleston, West Virginia. The barge, owned by Wyandotte Transportation Co., was taken in tow on March 21, 1961, by the towboat Eastern, owned and operated by Union Barge Line Corp. The barge, Wychem 112, was in the fourth and last tier of the four tiers of barges of the tow which kept the chlorine barge under easy observation from the towboat. At Baton Rouge the Wychem 112 was placed in the first tier away from direct observation of the towboat's pilothouse and in a position where it would bear the brunt of the weather. On March 23, 1961, with weather and visibility good but with a strong current the Wychem 112 began to dive and it sank near Vidalia, Louisiana, in the Mississippi River. Effort was made by the owners and operators of the barge in the fall of 1961 to locate and raise the cargo. Two objects were located, either of which could have been the wreck, both under hard packed sand. In November 1961 it was determined that further efforts would be unsuccessful and the owners tendered abandonment to the Government. Thereafter, the Government began a study of the extent and potential danger of the chlorine. In July 1962 technical opinions were issued to the effect that as long as the barge remained in the river it was a potential hazard in that a leak could develop at any time and recommendations were made to raise the chlorine tanks. The Government informed Wyandotte that it accepted abandonment and would proceed with removal under Section 19 of the Rivers and Harbors Act of 1899.[2] In view of the Government's opinion that the chlorine constituted a hazard to public health and safety, the President on October 10, 1962, proclaimed it a major disaster. The tanks were removed at a cost of approximately $3,081,000 with the concerted effort of civil defense, public health and state authorities.[3] The United States then brought suit against the cargo, shippers, carriers and consignee, alleging negligence in the construction, condition and towing of the barge to recover the costs of removal. Upon motion of the United States, the District Court ordered the sale of the chlorine cargo and containers which had been seized by the marshal at the commencement of the suit and the proceeds paid into court pending final disposition of the litigation.

The question brought before us in both of these cases is whether one may abandon with impunity an allegedly negligently sunk vessel which obstructs navigation or may the Government compel the negligent party to remove it or pay the cost of removal.

Appellant contends that under both the Rivers and Harbors Act of 1899, and under the federal common law of abatement of public nuisances, those responsible for the negligent sinking of a vessel in a navigable channel have a duty to remove the vessel or reimburse the United States if it conducts the removal operation. It is contended by the appellees that Section 15 of the Rivers and Harbors Act of 1899 gives the owner of a sunken vessel the right to abandon it and that Section 19 of the Act, which gives the Government the right to remove abandoned sunken vessels and proclaims the Government the owner of the vessels and proceeds of their

2. In the case of the Wychem the record indicates a possible conflict of evidence on the question of whether the Government accepted the abandonment. The trial court concluded that there was an abandonment and that the Government acknowledged and accepted the abandonment by attaching, seizing and selling the vessel, tanks and cargos when raised from the river. As will be seen later a determination of the question of abandonment is not necessary to our decision.

3. For an interesting account of the sinking of the barge, Wychem 112, and the raising of the chlorine containers, see Fales, "Time Bombs in the Mississippi," Popular Science Monthly, April 1963.

Of the total sum spent, $1,565,000 was for engineering expense. The remaining $1,516,000 was for public health and safety expense, which included precautions against hazards resulting from a possible rupture of the chlorine tanks during their removal.

sale, is the sole and exclusive remedy of the United States pertaining to the removal of such vessels from inland waterways.

Congressional action concerning the problem of abandoned craft in the navigable waters of the United States began with the passage of the Rivers and Harbors Act of 1880, 21 Stat. 180 et seq. Section 4, 21 Stat. 197, provided that when a sunken vessel obstructed navigation and was not removed "as soon as practicable," the vessel would be deemed abandoned and subject to removal by the Government. Two years later Congress enlarged the power of the Government granted in the 1880 Act by authorizing the sale of such sunken vessels before their removal.[4] In 1890 Congress enacted additional legislation[5] which contained two relevant provisions. Section 8, 26 Stat. 454, provided that if a wrecked vessel remained longer than two months it could be removed by the Government; and Section 10, 26 Stat. 454, prohibited the "creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters," and authorized the issuance of an injunction to compel the removal of such obstructions. Apparently the thrust of these statutes was to explicitly permit the Government to rid channels of abandoned vessels and also to make it clear that obstruction of navigation was unlawful. This is borne out in United States v. Hall, 63 F. 472 (1 Cir. 1894), where the Government brought an action to compel the removal of a wilfully abandoned and sunk vessel which obstructed navigation. The court held that vessels were obstructions within the meaning of Section 10 of the 1890 Act and ordered the defendant to remove them. Thus, the court did not interpret those portions of the various acts, which gave the Government the right to remove and sell abandoned vessels, to mean that an abandoned sunken vessel was not an obstruction prohibited by Section 10 of the Act.

Finally, in 1899 Congress enacted the Rivers and Harbors Act[6] involved in the present litigation. The purpose of this legislation was to codify the existing laws relating to navigable waters and House Conferees stated it made no essential changes in the existing law.[7] Since the Hall case was part of the existing law, it assumes great importance in making a final decision concerning the application of the various sections of the Act.

Those sections of the 1899 Act with which we are concerned are as follows:

Section 10:[8] The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures * * * except on plans recommended by the Chief of Engineer and authorized by the Secretary of the Army; * * *.

Section 12:[9] Every person and every corporation that shall violate any of the provisions of sections 9, 10 and 11 * * shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding, $2,500 nor less than $500, or by imprisonment not exceeding one year * *. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction * * *.

Section 15:[10] It shall not be lawful to * * * voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; * * *. And whenever a vessel, raft,

---

4. River and Harbor Act of 1882, 22 Stat. 191, 208–209.

5. River and Harbor Act of 1890, 26 Stat. 426 et seq.

6. 30 Stat. 1121 et seq., as amended, 33 U.S.C. § 401 et seq.

7. 32 Cong.Rec., 2296–2298; 32 Cong.Rec. pt. 3, 2923.

8. 30 Stat. 1151, 33 U.S.C. § 403.

9. 30 Stat. 1151, 33 U.S.C. § 406.

10. 30 Stat. 1152, 33 U.S.C. § 409.

or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it * * * and maintain such marks until the sunken craft is removed or abandoned * * * and it shall be the duty of the owner of such sunken craft to commence the immediate removal * * * and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States * * *.

Section 16:[11] Every person and every corporation that shall violate * * * sections 13, 14 and 15 of this title shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding, $2,500 nor less than $500, or by imprisonment for not less than 30 days nor more than one year. * * *.

Section 19:[12] Whenever the navigation of any river * * * shall be obstructed or endangered by any sunken vessel * * * and such obstruction has existed for a longer period than thirty days, or whenever the abandonment of such obstruction can be legally established in a less space of time, the sunken vessel * * * shall be subject to be broken up, removed, sold, or otherwise disposed of by the Secretary of the Army at his discretion * * *. That any money received from the sale of such wreck * * * shall be covered into the Treasury of the United States.

It has been argued that the only portions of the Act quoted above which are applicable to sunken vessels are Sections 15, 16 and 19. The obstruction of navigable waters by sunken vessels and the right of the Government to remove these abandoned sunken vessels is given separate and distinct treatment in the Act apart from all other obstructions, thus vessels have been removed from the ambit of Sections 10 and 12. In addition, the earlier Acts which formed the basis of the 1899 Act had no provisions similar to

Section 15 of the 1899 Act prohibiting the voluntary and careless sinking of craft in navigable waters, therefore Congress was explicitly treating vessels *in toto* in a section entirely apart from all other prohibitions. The Act further provides a separate criminal penalty for the violation of Section 15 as well as conferring upon the Government all rights of ownership in an abandoned vessel, thus other civil remedies provided by the Act for violation of other sections are inapplicable. Therefore, according to the argument, ignoring Sections 10 and 12 and reading the remaining sections literally, one with impunity can sink and abandon a vessel and incur only the loss of such abandoned vessel plus the possible imposition of the criminal penalties if the sinking occurred voluntarily or carelessly.

■ Although the statutory language is subject to an interpretation as the foregoing suggests, it is not attune with the legislative history or logical common sense. The history of the various acts demonstrates an intent of Congress to provide a method of government removal of vessels, not to limit the liability of those causing the sinking. It is illogical to conclude that a vessel is not an obstruction solely because it is given separate treatment. *Hall* bears this out. When that case was decided, provisions for the abandonment and removal of sunken vessels were in existence, but nevertheless the court found that a vessel was still an obstruction. Also, the introduction of the prohibition of Section 15, "unlawful to voluntarily or carelessly sink" seems more likely to be just an emphatic restatement of the Section 10 prohibition against creating an obstruction, and not an effort to remove sunken vessels from the reach of Section 10. In addition, the imposition of a separate criminal penalty along with giving the Government the right to remove and sell the abandoned vessel does not preclude a vessel from being an obstruction.

It has also been argued that even though a vessel is properly an obstruction,

---

11. 30 Stat. 1153, 33 U.S.C. § 411.

12. 30 Stat. 1154, 33 U.S.C. § 414.

the injunction remedy of Section 12 is not applicable to obstructions but just to structures which are separately listed in the various sections. This we think is reading out of a statute what Congress clearly meant to include. There is no reason to limit the injunction to the items which must be built by approval from the Government to the exclusion of obstructions which is the *primary* prohibition of Section 10. The prohibition is directed to "the creation of *any* obstruction" and is not limited to obstructions which are *created* in a peculiar or particular manner.

In addition, the statutes do not specifically authorize a suit by the Government for the recovery of removal expenses. This we think is implied. It is illogical to reason that the Government having been given the right to remove is penalized for exercising its right, and in order to gain full benefit from the statutory provisions must wait for the slower injunctive process. The right to recover *in rem* from the vessel so removed flows from ownership of the vessel and does not preclude recovery of reasonable removal costs from a tortfeasor.

Our reading of the statutes now needs to be considered in light of the cases decided under the Act. Unfortunately, they are inconclusive and at best have muddied the waters surrounding the sunken vessels.

Several cases, Loud v. United States, 286 F. 56 (6 Cir. 1923); The Manhatten, 10 F.Supp. 45 (D.C.Pa.1935), aff'd 85 F.2d 427 (3 Cir. 1935), cert. denied, sub nom United States v. The Bessemer, 300 U.S. 654, 57 S.Ct. 432, 81 L.Ed. 864 (1937); In re Eastern Transportation Co., 102 F.Supp. 913 (D.C.Md.), aff'd sub nom Ottenheimer v. Whitaker, 198 F.2d 289 (4 Cir. 1952); United States v. Bethlehem Steel Corp. (The Texmar), 319 F.2d 512 (9 Cir. 1963), have concluded that the Sections 10 and 12 are not applicable to sunken vessels. In *Loud* the United States brought an action to recover the amount expended in straightening a sunken vessel in a navigable channel. The sunken barge, owned by Loud, had collided with an abutment and sunk, thus obstructing navigation. The Government after straightening the vessel surrendered it to the owner. The court denied recovery and held that the United States only had a claim against the vessel which it lost by voluntarily surrendering ownership. Significant here is the fact that there were no claims of negligence on the part of Loud, therefore, it may be assumed the collision and sinking were neither the result of wilfulness nor carelessness on the part of Loud. That being true, the case is correctly decided in that Loud has not violated any provision of the Act subjecting him to liability. In *The Manhatten* the Government raised its sunken dredge and sought reimbursement from those responsible for its sinking. The court in deciding against the Government considered only the sections of the Act pertaining to the sinking and abandonment of the vessel, and found nothing in the statute allowing the Government to recover from a tortfeasor. The *Ottenheimer* case presented the court with the question of whether the owner of floating barges could abandon them in navigable waters and allow them to sink. The court concluded that despite the forceful opinion of the *Hall* case a vessel was not a structure within the meaning of Sections 10 and 12. Hence it decided the case under Section 15 and concluded that an owner could only abandon a vessel by virtue of "fire, storm, collision or unforeseen unseaworthiness." Since this abandonment was wilful and not one of the above, the court ordered the owners to remove the floating barge. In the *Texmar* case, which is factually similar to the present case, the Government raised an allegedly negligently sunk vessel and sought reimbursement. While admitting the statutes were confusing, the court concluded that sunk vessels were treated outside Section 10; and since Section 15 limited itself to criminal penalties and Section 19 gave the Government the right to recover against the vessel, the Government had no claim. The dissent in the *Texmar* case took the other approach. The removal provisions are not a substi-

tute for Section 10 but the prohibition of Section 10 applies also to vessels.

The line of reasoning in the *Texmar* dissent is demonstrated in several cases. United States v. Bridgeport Towing Line Inc., 15 F.2d 240 (D.C.Conn.1926); United States v. Wilson, 235 F.2d 251 (2 Cir. 1956); United States v. Zubik, 295 F.2d 53 (3 Cir. 1961). In *Bridgeport* a craft, during salvage operations slipped and sank due to the negligence of the defendants, resulting in an obstruction to navigable waters. The Government sued for an injunction under Section 12 to compel the owners to remove the craft. The court, while holding that the provisions of Section 10 and 12 are applicable to the facts presented, denied relief on the ground that the prohibition against the creation of obstructions meant only a prohibition against the wilful not negligent, creation of navigable obstructions. The *Wilson* case held that a sunken barge was properly an obstruction under Section 10 but the injunction provision of Section 12 only applied to structures and not to obstructions. In *Zubik* the court treated the Section 12 injunctive power and the provisions of Section 19, giving the Government the right to remove sunken vessels, as an election. And since the Government chose to raise the vessel, its rights were limited to the vessel itself or to the proceeds from the sale of such vessel.

Three cases, United States v. Bethlehem, 235 F.Supp. 569 (D.C.Md.1964); United States v. Perma Paving Co., 332 F.2d 754 (2 Cir. 1964); United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960), although not dealing with the problem of sunken vessels, shed light on whether the Section 12 injunction is properly applicable to obstructions. In *Bethlehem* the defendant deliberately grounded a floating drydock in navigable waters. The court held that the drydock was not a vessel, but an obstruction under Section 10, and thereby granted an injunction for its removal. In *Perma* the defendant put excessive weight on his property causing silt to move into the bed of a stream causing obstruction to navigation. The Government sought reimbursement for dredging the channel. The court recognized the application of the injunction power and concluded that there was no basis for reading the statute narrowly; and since the Government could have compelled *Perma* to remove the silt, the Government could seek reimbursement for its dredging operations. In *Republic Steel* the Government sought to compel the removal of deposits. The Supreme Court held there to be an obstruction and granted an injunction not by Section 12 but solely under Section 10. The prohibition of an act carried with it the inherent power to enjoin the act.

These cases not only demonstrate an approach far from uniform but illustrate the myriad interpretations of the statutes in question. Faced with this array of diversified opinion we are necessarily thrown back to the legislative history and the wording of the statutes themselves, which leads us to conclude that those cases finding a vessel an obstruction under Section 10 and thus subject to the injunction power of Section 12 are to be given the greatest weight.

Our reading of the statute is identical with an administrative interpretation [13] adopted by the Army Corps of Engineers which provides in part:

"* * * a person who wilfully or negligently permits a vessel to sink in navigable waters of the United States may not relieve himself from all liability by merely abandoning the wreck. He may be found guilty of a misdemeanor and punished by fine, imprisonment, or both, and in addition may have his license revoked or suspended. He may also be compelled to remove the wreck as a public nuisance or pay for its removal."

This is not "an authorized effort to administratively improve the statute" [14] but

---

13. 33 C.F.R. 209.410 (1962), first published at 11 Fed.Reg. 177A–828 (1946).

14. The Texmar, 319 F.2d at 520.

a clear and precise statement of what the statute actually says.

Appellees point out that Congress must think it is required to raise vessels from navigable waters for it appropriates funds for "[r]emoving sunken vessels or craft obstructing or endangering navigation." 31 U.S.C. § 725a (b) (14). This is certainly no support for the right of an owner to abandon his vessel with impunity because the Government must always bear removal costs of innocent owners; and also the Government might wish to remove a negligently or wilfully sunk vessel instead of enforcing the injunctive process. No doubt there have been cases in the past, and most likely others will arise in the future, when removal by the Government would be the preferred remedy in order to avoid the delays inherent in litigation seeking an injunction. In such a situation the Government would need appropriations for the removal even though it could get reimbursed.

■ Therefore, we believe the correct reading of the statute allows only an innocent owner to abandon his ship and that a negligent party must raise the vessel or pay for its removal. Although appellees point out that a decision imposing liability on them catches them unprepared for such an occurrence, such an argument seems inappropriate as a means of avoiding the consequences of one's negligence.

■ A vast inland waterway such as we have under consideration here, the Mississippi River, is a national highway in which all of the people have an interest.[15] It is a national asset. Such streams rarely, if ever, come to us in useful form in their natural state when measured by the standards and requirements of present day commerce. Precisely for this reason the national Government, and in many cases state and local governments as well, have spent vast sums in successful research and efforts to improve, prepare and maintain them as natural resources. The national character of this natural resource gives the Government an essential federal interest in it as a national artery of commerce.

It is not reasonable, we conclude, for the national Government to go to such trouble and expense to prepare, preserve and maintain this river, allow its use to be impaired seriously by those who use it most, and then permit such users to insulate themselves from liability for proved negligence. Moreover, our interpretation of the statute is not unusual in view of the wide-spread national interest in its subject matter. For example, in dealing with anti-trust legislation involving statutes of remarkable brevity but of wide-spread application, Chief Justice Hughes stated that the Sherman Antitrust Act, "[a]s a charter of freedom, * * * has a generality and adaptability comparable to that found to be desirable in constitutional provisions. * * * The restrictions the act imposes are not mechanical or artificial. Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness." Appalachian Coals, Inc. v. United States, 288 U.S. 344, 359–360, 53 S.Ct. 471, 474, 77 L.Ed. 825 (1933). See also Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Report of the Attorney General's National Committee to Study the Antitrust Laws (1955), p. 5 et seq.

While it is true that the statutes under consideration could have been drafted with greater clarity and more detail, it is clear to us that the Congressional intent underlying the Rivers and Harbors Act to prevent interferences with and obstructions to navigable streams is so compelling and fundamental as to require the inference that appropriate civil remedies may be applied to those responsible for such interferences and obstructions. See United States v. Republic Steel, supra.

15. See, for example, 33 U.S.C. § 10:
"All the navigable rivers and waters in the former territories of Orleans and Louisiana shall be and forever remain public highways."

Nor do we consider the reasoning which we have applied to be at variance with fundamental concepts of the law of negligence. In 1897 Mr. Justice Holmes stated:

"I think that the law regards the infliction of temporal damage by a responsible person as actionable, if under the circumstances known to him the danger of his act is manifest according to common experience, or according to his own experience if it is more than common, except in cases where upon special grounds of policy the law refuses to protect the plaintiff or grants a privilege to the defendant."

"The Path of the Law" (address delivered in 1897); reprinted in "Jurisprudence in Action", p. 276; "A Treasury of Legal Quotations" (Cook 1961), p. 131. In the circumstances of this case the inherent, imminent and impending danger of the presence of 2,220,000 pounds of deadly chlorine gas in the channel of the Mississippi River, and the obstruction resulting from the presence of the sunken barges L 1 and M 65, were certainly and positively clear to these appellees who were engaged in the "more than common experience" of using the river. We are unable to find any special grounds of policy upon which to refuse relief to the Government or to grant a special privilege or exemption to the defendants if it is proved that their negligence caused the sinking of the barges.

Since appellees' liability stems from their allegedly negligent acts regarding the sinking of the various vessels, it must be determined whether the alleged acts constituted negligence on the part of any of the defendants. If the defendants in the *Cargill* case are found to be negligent, the court should order the defendants to raise the barges, M 65 and L 1, from the navigable waters of the Mississippi River or bear the reasonable cost of their removal. If negligence is found on the part of the defendants in *Wychem*, the damages to which the Government is entitled are those reasonably flowing from appellees' negligence and subsequent failure to raise the vessel. Since the Government properly could have demanded the removal, the cost of removal by the Government is to be given consideration in fixing damages but is not conclusive.

Since we have properly found liability under the Act, it is not necessary to deal with the contentions of the appellant that under the federal common law the appellees are liable for the abatement of a public nuisance.

Judgment reversed and the cases are remanded for a determination of whether the acts of the various defendants constituted negligence.

Reversed and remanded.

## ON PETITION FOR REHEARING

### PER CURIAM:

Upon consideration of the petition for rehearing by Union Carbide Corporation, we conclude that there are no allegations or proof of negligence on the part of Union Carbide Corporation and that the summary judgment of the District Court in its favor ordering dismissal of the libel against it should be and the same hereby is affirmed. The opinion, judgment and mandate of this Court are hereby modified and amended in accordance with this order.

It is further ordered that the petition for rehearing by all of the other parties in said cause be, and the same is hereby denied.