UNITED STATES of America

v.

OHIO BARGE LINES, INC., in personam and M/V STEEL FORWARDER, her engines, tackle, appurtenances, etc., in rem,

v.

John DOE, Richard Roe, ABC, Inc. and XYZ Co., in personam, and the Vessels, Tackle and Appurtenances, Jane Doe and Mary Roe, in rem, Third Party Defendants,

Ohio Barge Line, Inc., and the M/V Steel Forwarder, her engines, tackle, etc., in rem, Appellants.

No. 78–2630.

United States Court of Appeals, Third Circuit.

Argued Sept. 6, 1979.

Decided Oct. 22, 1979.

---

Wayne L. Emery (argued), Richard J. Munsch, Pittsburgh, Pa., for appellants.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Robert J. Cindrich, U. S. Atty., Pittsburgh, Pa., Patrick A. Fayle (argued), Ronald R. Glancz, Attys., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before SEITZ, Chief Judge, VAN DUSEN, Senior Circuit Judge, and GIBBONS, Circuit Judge.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

This appeal attacks a November 2, 1978, district court judgment[1] in favor of plaintiff and against the defendants, Ohio Barge Lines, Inc. (OBL) and M/V Steel Forwarder (Forwarder), her engines, tackles, appurtenances, etc., *in rem*, in the sum of $15,-680.00,[2] with interest at the prevailing rate from the date of expenditure.[3] Plaintiff alleges violations of §§ 10 and 15 of the Rivers and Harbors Act of 1899 (33 U.S.C. §§ 403 & 409), by the Forwarder and its operator and owner, OBL. We vacate the district court judgment due to an absence of findings of fact and conclusions of law, as required by F.R.Civ.P. 52, and remand principally for the filing of such findings and conclusions by the district court.

Jurisdiction in the district court was based upon 28 U.S.C. § 1345 and jurisdiction in this court is based upon 28 U.S.C. § 1291.

The evidence showed that the Ohio River is one of the nation's navigable rivers maintained by the Corps of Engineers. Until their removal sometime after 1972, lock and dam 49 were aids to navigation at mile 845 on the Ohio River. The dam was submersible and the lock was on the right ascending shore of the river, the Kentucky side. The dam was normally submerged during high water conditions so that traffic would not have to go through lock 49. When the dam was raised, water was permitted to pass through openings on the Indiana side of the dam, called beartraps.

The Uniontown lock and dam, which were designed to replace dam 49, are navigational aids at mile 846 on the Ohio River. In 1972, the lock had been completed and the dam was under construction. The Uniontown lock was on the left ascending shore, the Indiana side, and during the summer of 1972 the dam was being constructed within a cofferdam which extended from the middle of the river toward the Kentucky side. This left a 500-foot opening (the pass) between the cofferdam and the outer wall of the Uniontown lock, which was open to navigation. The Uniontown dam was approximately one mile below the 49 dam, and the distance from the downstream lock wall of lock 49 to the upstream lock wall of the Uniontown lock was approximately 3500 feet. When required to use both locks, tows would have to cross the full width of the river in this short distance.

The water conditions created by these structures were hazardous. When dam 49 was raised and the beartraps were open, a counter-clockwise eddy dominated the pool between the two dams. This eddy swept directly across the upstream entrance to the Uniontown lock, making entry and exit from that lock difficult for long tows, which could be swept out of control when crossing the current. When dam 49 was submerged, this eddy did not exist. Regardless of the position of dam 49, a substantial head of water was created at the Uniontown pass by the narrowing of the channel produced by the cofferdam. The water level was often a foot-and-a-half higher immediately above the cofferdam than immediately below. Despite this head of water, it was customary for tows to go through the pass, rather than the Uniontown lock.

On the night of June 26–27, 1972, the Forwarder was approaching the Uniontown dam heading upstream. The Forwarder is a 5000 horsepower towboat, 168 feet long and 40 feet wide, owned and operated by OBL. At this time the master of the Forwarder was Stanley Roll and the pilot was Charles Young. The Forwarder was pushing 17 barges laden with ore, 15 ahead (3

---

1. *United States v. Ohio Barge Lines, Inc.*, 458 F.Supp. 1086 (W.D.Pa.1978).

2. The above sum represented the cost of helper boat service for vessels going between lock 49 and the Uniontown lock from July 25 to August 3, 1972, and August 10 to August 20, 1972, when dam 49 of the Ohio River was raised and the Uniontown pass was closed due to the

sinking, at the downstream approach to the pass, of three barges being pushed upstream by Forwarder in the early morning of June 27, 1972.

3. See *United States v. Ohio Barge Lines, Inc., etc. et al.*, *supra* note 1, Civil No. 75–783, W.D. Pa., Documents 98 and 99.

wide and 5 long) and one lashed to each side. This made the tow 1070 feet long and 105 feet wide.

At midnight the watch changed and pilot Young received the helm. All barges were inspected and found to be in good order. At this time the tow was nine miles below the Uniontown dam. The tow moved upstream until it was required to move out of the main channel, approximately three-quarters of a mile below the Uniontown lock, and stand out of the current waiting for a vessel coming downstream to negotiate the pass. Once the other vessel was below it, the Forwarder headed back into the main channel at full throttle with its search lights on. This throttle setting is customary when taking a tow from a full stop into a swift current, because it gives the tow sufficient maneuverability to maintain control in the current. However, when going through exceptionally rough water, such a throttle setting is dangerous, as excessive speed in such conditions can cause barges to dive under the water and sink. Pilot Young testified that he planned to throttle back shortly before the bow of the tow reached the pass so as to safely negotiate the head of water, but that while the bow was still 600 feet below the pass, the front three barges dove into the water and sank. All three barges were owned by OBL.

The Coast Guard was immediately informed, and the next day it placed a marker on the sunken barges, which were approximately 300 feet from the Uniontown lock wall. At this time the pass remained open to navigation. However, on July 8, 1972, the Coast Guard was notified that its buoy had disappeared and that the barges had apparently shifted. One of the barges had in fact shifted to within 200 feet of the Uniontown lock wall. The Coast Guard determined that the narrowness of the channel between that barge and the wall, and the possibility that the barges would shift again, required closing the pass to all navi-

gation until all of the barges had been removed. The pass, accordingly, was officially closed to navigation until August 19, 1972, when the salvor hired by OBL completed the removal.

After the pass was closed, all vessels were required to use the Uniontown lock. The Corps of Engineers determined that a helper boat was needed to help tows maneuver in and out of the upstream entrance of the Uniontown lock when dam 49 was raised and the beartraps were open. The helper boat assisted tows through the cross-currents and eddies and thereby protected the tows, the Uniontown lock wall, the cofferdam, and OBL's salvage operation. During the time the pass was closed, dam 49 was raised from July 25 until August 3 and from August 10 until August 20. The Corps contracted with Mt. Vernon Barge Cleaning, Inc. for the use of a helper boat, the M/V Jeffery Lynn, during those periods.

When OBL refused to reimburse the Corps for this expense, this suit was filed. In the district court, the Government contended that the defendants were liable for the cost of the helper boat on a theory of strict liability under either § 10 or § 15 and, in the alternative, that the defendants were liable on a negligence theory under either § 10 or § 15. The district court adopted the Government's interpretation of § 10 and held the defendants liable on a theory of strict liability under § 10. Also, the court apparently concluded that the defendants were negligent.[4] The defendants appeal from this judgment.

I. *Contentions under Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403)*

■ The district court held that § 10 prohibits the innocent sinking of vessels. We do not agree. Section 10 makes the creation of any obstruction in the navigable streams and channels of the United States illegal.[5] For the section to control this case,

---

4. The district court used the language quoted below at page 631 (458 F.Supp. 1094).

5. Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403):

we would have to hold that a sunken vessel is an "obstruction" and that § 10 should be read to impose strict liability for the creation of an obstruction with a vessel. As we reject the Government's strict liability argument under these circumstances, we need not decide whether a sunken vessel can be an obstruction under any circumstances.[6]

We reject the strict liability interpretation primarily because a violation of § 10 exposes one to criminal sanctions under

§ 403. Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

6. The circuits are in disagreement as to whether a vessel can be an obstruction under § 10. The Fifth Circuit has decided that a vessel is an obstruction. *University of Texas Medical Branch v. United States*, 557 F.2d 438 (5th Cir. 1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978); *United States v. Raven*, 500 F.2d 728 (5th Cir. 1974), *cert. denied*, 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975); *United States v. Cargill, Inc.*, 367 F.2d 971 (5th Cir. 1966), *aff'd on other grounds sub nom., Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). The Fourth and Ninth Circuits have concluded that § 15 controls all matters relating to sunken vessels, and that a sunken vessel cannot be an obstruction under § 10. *In re Eastern Transp. Co.*, 102 F.Supp. 913 (D.Md.), *aff'd sub nom., Ottenheimer v. Whitaker*, 198 F.2d 289 (4th Cir. 1952); *United States v. Chesapeake & Delaware Shipyard, Inc.*, 369 F.Supp. 714, 720 n. 5 (D.Md.1974); *United States v. Bethlehem Steel*

§ 12,[7] including possible imprisonment. Accordingly, as a penal statute, § 10 should be construed strictly. *United States v. Bigan*, 170 F.Supp. 219, 223 (W.D.Pa.1959), *aff'd*, 274 F.2d 729 (3d Cir. 1960).

The Supreme Court has noted that § 10 should be read "charitably in light of the purpose to be served" and should not be given "a narrow, cramped reading," *United States v. Republic Steel Corp.*, 362 U.S. 482, 491, 80 S.Ct. 884, 890, 4 L.Ed.2d 903 (1960). The Government asserts that this language

*Corp.*, 319 F.2d 512 (9th Cir.), *cert. denied*, 375 U.S. 966, 84 S.Ct. 484, 11 L.Ed.2d 415 (1963).

The difference in these conclusions seems to arise largely from an interpretation of the First Circuit's opinion in *United States v. Hall*, 63 F. 472 (1st Cir. 1894), in which that court employed § 10 of the Rivers and Harbors Act of 1890, the predecessor of § 10 of the Rivers and Harbors Act of 1899, to require the removal of a vessel which was intentionally sunk by its owner. The Fifth Circuit found this holding to be most important in reaching its interpretation that a vessel could be an obstruction under § 10 because the legislative history of the 1899 Act stated that it was merely intended to be codification of the existing laws relating to navigable waters. *United States v. Cargill, supra* at 974. However, as the Rivers and Harbors Act of 1890 had no provision dealing explicitly with wrecks and as the 1899 Act added § 15, which achieves the result of *United States v. Hall, supra*, it is not clear that the reenactment requires the Fifth Circuit's interpretation.

7. Section 12 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 406):

"§ 406. Penalty for wrongful construction of bridges, piers, etc.; removal of structures

"Every person and every corporation that shall violate any of the provisions of sections 401, 403, and 404 of this title or any rule or regulation made by the Secretary of the Army in pursuance of the provisions of section 404 of this title shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States."

in *Republic Steel* requires adoption of its position on strict liability. However, the Supreme Court's statement reflects the principle that the strict construction of a penal statute should not be permitted to defeat the policy of the statute, *Ash Sheep Co. v. United States*, 252 U.S. 159, 170, 40 S.Ct. 241, 64 L.Ed. 507 (1920), and it is not inconsistent with the application of accepted principles of statutory construction.

 Several principles of construction lead us to the conclusion that § 10 should not be read to create strict liability. Specifically, it is settled law that a requirement of criminal intent should be implied in penal statutes, and that statutes should not be interpreted so as to lead to unreasonable or unjust results. *United States v. Kirby*, 7 Wall. 482, 74 U.S. 482, 19 L.Ed. 278 (1869); *American Dredging Co. v. Local 25, Marine Div., International Union of Operating En-*

*gineers*, 338 F.2d 837, 842–43 (3d Cir. 1964), *cert. denied*, 380 U.S. 935, 85 S.Ct. 941, 13 L.Ed.2d 822 (1965). Imprisoning those who have without fault caused a ship to be sunk in a navigable waterway seems both unreasonable and unjust.

Interpreting this statute to create strict liability for the sinking of vessels is also inconsistent with the structure of the Act. Section 15, in conjunction with § 16, specifically addresses the liability of those responsible for sinking vessels. Section 15 makes it illegal "to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels . . ." [8] However, § 16 imposes criminal sanctions only against those individuals who *willfully* breach § 15.[9] Interpreting § 10 to impose liability for the unintentional sinking of a vessel would create the anomaly of imposing criminal sanctions under a general provision of a statute on an activity which is

---

**8.** Sections 15 and 16 of the Rivers and Harbors Act of 1899 (33 U.S.C. §§ 409 and 412):

"§ 409. Obstruction of navigable waters by vessels; floating timber; marking and removal of sunken vessels

"It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as 'sack rafts of timber and logs' in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title.

"§ 412. Liability of masters, pilots, and so forth, and of vessels engaged in violations

"Any and every master, pilot, and engineer, or person or persons acting in such capacity, respectively, on board of any boat or vessel . . . who shall willfully obstruct the channel of any waterway in the manner contemplated in section 409 of this title, shall be deemed guilty of a violation of sections 401, 403, 404, 406, 407, 408, 409, 411 to 416, 418, 502, 549, 686, and 687 of this title, and shall upon conviction be punished as provided in section 411 of this title, and shall also have his license revoked or suspended for a term to be fixed by the judge before whom tried and convicted. And any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408, and 409 of this title shall be liable for the pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft, which latter sum shall be placed to the credit of the appropriation for the improvement of the harbor or waterway in which the damage occurred, and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof."

**9.** The classification of negligent sinkings as unlawful under § 15 is not meaningless, as it may serve to expose the vessels causing the sinking to liability. *Cf. Wyandotte, supra.*

not prohibited by the section of the statute specifically addressing the problem.[10]

Moreover, interpreting § 10 to prohibit any sinking of a vessel would render the provisions in § 15, prohibiting the voluntary or careless sinking of vessels, redundant. It would seem a salutory rule to avoid reading the terms of a statute as mere surplusage in the absence of some proof that they were so intended. The same considerations outlined above also lead us to conclude that the negligent sinking of a vessel is not prohibited by § 10.

In sum, we decline to accept the Government's invitation to expand § 10 to include the innocent or negligent sinking of vessels under its prohibition against "the creation of any obstruction."

## II. *The Strict Liability Contention under Section 15 (33 U.S.C. § 409)*

The Government's second argument is that under the last clause of § 15 the defendants had a duty to remove the barges, that they failed to discharge this duty by refusing to pay for the helper boat, and that the Government should be able to obtain relief under that section. Section 15 states in part that

". . . whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, . . . it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title."

From this language it is clear that the owner of an innocently sunken vessel has a duty to remove it. However, it is equally clear that no *in personam* remedy against the owner of such a vessel for the breach of this duty is expressed in favor of the Government. The Government urges this court to imply such a remedy under § 15 in favor of the Government for removal expenses against the owners of innocently sunken vessels.[11] In light of the Supreme Court's guidance in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), we believe that such a cause of action should not be implied.

The Supreme Court outlined the tests for implying remedies in federal statutes in *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2088:

"In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' [Citing case]—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? [Citing case.] Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [Citing cases.] And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? [Citing case.]"

These tests have previously been applied to § 15 of the Rivers and Harbors Act in *Wyandotte*, when the Supreme Court implied an *in personam* remedy in favor of the Government for costs incurred in removing negligently sunken vessels. In applying the first test to § 15, the Supreme Court held that "a principal beneficiary of the Act, if not the principal beneficiary, is the govern-

---

**10.** Although the Fifth Circuit has interpreted § 10 to prohibit the creation of an obstruction by negligently sinking a vessel, *United States v. Cargill, Inc.*, 367 F.2d 971 (5th Cir. 1966); *University of Texas Medical Branch v. United States*, 557 F.2d 438 (5th Cir. 1977), that court has noted the anomaly created by its interpre-

tation of § 10. *University of Texas, id.* at 444 n. 10.

**11.** We need not and do not decide in this case whether a helper boat, as employed on this record, is a removal cost.

ment itself." *Wyandotte, supra*, 389 U.S. at 201, 88 S.Ct. at 386.

In interpreting the second factor, the legislative intent of the statute to create a remedy against the owner of an innocently sunken vessel, *Wyandotte* provides less guidance. In implying a remedy against the negligent owner, the Court in *Wyandotte* relied heavily upon the fact that a negligent sinking was unlawful under § 15 and that a failure to imply a remedy would place the Government in the position of having to pay for someone's illegal acts. The injustice of such an interpretation was manifest. However, it is not illegal to sink a vessel innocently under § 15. Furthermore, the last clause of § 15 primarily sets standards for establishing abandonment, so that the Government will not be held liable for "taking" the sunken vessels it removes. From this scheme we can find no legislative intent to create the requested remedy.

In applying the third factor, the consistency of the requested remedy with the underlying purposes of the Act, *Wyandotte* again provides only partial guidance due to its concentration on the negligence issue. However, it shows that the statute is primarily designed to deter the avoidable sinking of vessels by imposing criminal or financial sanctions upon the intentional or negligent sinking of vessels. Imposing financial burdens on the owners of innocently sunken vessels will not deter those sinkings, but will only serve to protect the Government from expense. Saving the Government from expense is one policy of the statute, *Wyandotte, supra* at 204, 88 S.Ct. 379, but, standing alone, it is insufficient to justify the implication of a remedy which readily could have been expressed by Con-

gress. From this we conclude that the requested remedy is not clearly consistent with the underlying purposes of the Act.

In light of these considerations,[12] we will not imply a remedy in favor of the Government for the costs of removal of an innocently sunken vessel under § 15 on this record.[13] See *In re Marine Leasing Services, Inc.*, 471 F.2d 255 (5th Cir. 1973), and *United States v. Osage Co.*, 414 F.Supp. 1097, 1101 (W.D.Pa.1976).

### III. The Negligence Contention under Section 15 (33 U.S.C. § 409)

Finally, the Government also proceeded against the defendants under § 15 on the basis that the sinking had been negligent and that the negligence had caused the need for the helper boat. It is clear that the Government can obtain reimbursement for removal expenses from the owner of a negligently sunken vessel under § 15. *Wyandotte, supra.* However, on this record the Government's claim under § 15 cannot stand as the district court did not "find the facts specially and state separately its conclusions of law thereon" in its opinion, as required by F.R.Civ.P. 52(a). See *Pepi, Inc. v. Helcar Corp.*, 458 F.2d 1062, 1064–65 (3d Cir. 1972); *O'Neill v. United States*, 411 F.2d 139, 146 (3d Cir. 1969).

At the end of the district court's opinion, the trial judge addressed the issue of negligence. At 458 F.Supp. 1094 the opinion states:

"I find a lack of precautionary measures and concern on the part of the defendant's employees in negotiating this long and awkward tow through a passage which the defendant knew or should have

---

**12.** The final factor presents no obstacle to implying a remedy, as admiralty law is not an area traditionally relegated to state law.

**13.** We note that in *Wyandotte, supra*, 389 U.S. at pages 194–95, 88 S.Ct. at 382, the Court pointed out the hazardous possibilities in terms of casualties of removing the barge, which are not present on this record:

"The *Wyandotte* libel is founded on facts more dramatic. A barge loaded with 2,200,000 pounds of liquid chlorine sank while being pushed in the Mississippi near Vidalia,

Louisiana. . . . Wyandotte stated that it was abandoning the vessel. The Government began a study of the danger posed by such a substantial load of chlorine at the bottom of the Mississippi. It was feared that if any chlorine escaped it would be in the form of lethal chlorine gas, which might cause a large number of casualties. The Government demanded that Wyandotte remove the barge. Wyandotte refused to do this."

known [had] * hazardous currents and eddies.

". . . Alternative passage was provided through the Uniontown Lock but the defendant chose to disregard this for a passage through a channel known by all who plied the river to be hazardous."

In *O'Neill, supra* at 146, this court said:

"Rule 52(a) requires that the trial court 'shall find the facts specially and state separately its conclusions of law thereon.' This requirement is not met by the statement of the ultimate fact without the subordinate factual foundations for it which also must be the subject of specific findings. This is especially true in cases like this, involving the application of factual findings to the ultimate judgment whether conduct reached the level of due care. Whether in the circumstances of a particular case one failed to exercise due care or to take adequate protection or safeguards, or performed his work in a safe manner, is an ultimate determination which necessarily is premised on subordinate findings. These findings may not be left unarticulated. If they actually were reached in the process of arriving at the ultimate factual conclusion, they must be stated. If they did not enter into the process by which the ultimate [conclusion of negligence] was made, then it was without any supporting foundation. In either case, therefore, it is necessary that the trial court specify these subordinate facts upon which the ultimate . . . conclusion must rest."

■ It is not clear that the above language quoted from the district court opinion contains a legal conclusion of negligence and there is an absence of specially found facts to support such a conclusion. There is

not even a finding that the "lack of precautionary measures and concern" caused the sinking. Moreover, the record reflects that those who traveled on the river recognized that the head of water at the cofferdam presented a hazard. The court's language, "known by all who plied the river to be hazardous," indicates that in making its finding the court determined that the defendants' disregard of the risk produced by the head of water at the cofferdam was negligent. The court found, however, that the barges sank 600 feet below the head of water. Thus, the risk cited by the court to establish negligence may not have caused the sinking. It is established law that where the harm which in fact results is caused by factors or forces which form no part of the recognizable risks involved in the actor's conduct, the actor is not liable. *United States v. Moran Towing & Transp. Co.*, 409 F.2d 961, 963 (4th Cir. 1969); *Berry v. Sugar Notch Borough*, 191 Pa. 345, 43 A. 240 (1899); Restatement (Second) of Torts, § 281(f); Prosser, *The Law of Torts* § 41, p. 237 (4th ed. 1977).

■ For negligence to have existed, the defendants must have been handling the Forwarder in a negligent manner in light of the water conditions which existed 600 feet below the cofferdam. It is undisputed that at the time of the sinkings, the Forwarder's engines were set at full throttle. It is also undisputed that this creates no risk of sinking except in turbulent water conditions. There was uncontradicted expert testimony offered by the defendants indicating that the throttle setting complied with professional piloting standards, if the current below the cofferdam was moving swiftly and without severe eddies or heads of water.[14]

---

* It appears that the word "of" in place of "had" is a typographical error in the district court opinion.

14. The Forwarder had been forced to wait out of the channel nearly dead in the water until another vessel came downstream through the pass. The Forwarder then moved into the main channel at full throttle so as to gain enough speed to make headway into the pass

and maintain maximum steerage and maneuverability (113a, 130a–131a). The uncontradicted testimony showed that it was customary to reduce speed at the head of water at the cofferdam, because such rough water could cause the lead barges to dive if they were pushed too hard (114a). However, if the tow entered the pass too slowly, it could be pushed sideways into the cofferdam (131a). Accordingly, the uncontradicted evidence appears to

Thus, the existence of negligence may turn on the question of whether turbulent water conditions existed in the channel below the cofferdam and whether the OBL's agents should have known of their existence [15] and reduced the speed of the tow. The Government's expert witness on currents presented some evidence that an eddy would exist below the cofferdam on the Kentucky side of the river (Tr. 233–241). However, this witness did not make clear the severity of these eddies or their impact on the channel 300 feet from the Uniontown wall, where the barges were sunk. Even if there were severe eddies below the cofferdam, the Government appears to have presented no evidence that the pilot should have been aware of this condition. Uncontradicted expert testimony presented by the defendants indicates that a pilot would not expect dangerous eddies below the cofferdam because the river widened at that point. This might cause a pilot to expect that the velocity of the current would decrease and that severe eddies would not exist (132a). The district court may need to address such matters on remand.[16]

We specifically reserve, and express no opinion on, these issues, which may have to be considered by the district court after examination of the authorities, including legislative history of § 15 (33 U.S.C. § 409):

(1) Does § 15 (33 U.S.C. § 409) authorize, at a negligent vessel owner's expense, the employment of a helper boat or other aids to navigation, in addition to the removal of the obstruction to navigation? [17]

(2) Is the *in rem* remedy contemplated by § 15 (33 U.S.C. § 409) available against other vessels, such as The Forwarder, of the owner of the sunken vessel as well as against the sunken vessel itself?

See also note 11 above.

The case will be remanded to the district court for further consideration in light of this opinion and the record.

have been that, if there were no substantial eddies or heads of water below the cofferdam, it was proper for the Forwarder to be at full throttle right until the bow of the tow reached the head of water at the cofferdam, at which point the speed would have to be reduced (131a).

**15.** It is well established that negligence is conduct which falls below a standard established by the law for the protection of others against unreasonable risk of harm, and that risk necessarily involves a *recognizable* danger. Therefore, if the defendants had no reason to know of turbulent water, they would not be negligent in placing the throttle at full ahead. Prosser, *The Law of Torts*, § 31, p. 146 (4th ed. 1971).

**16.** The Government asserts that the defendants created a public nuisance when they violated statutory duties imposed upon them by §§ 10 and 15 of the Rivers and Harbors Act by sinking the three barges. There is doubt whether a nuisance remedy exists in this area, *Wyandotte, supra*, 389 U.S. at 196 n. 5, 88 S.Ct. 379. The court may need to consider this contention on remand.

**17.** The cases cited at pages 38–45 of appellants' brief, including the following, are not directly on point on this question: *Mid America Transp. Co. v. National Marine Service, Inc.*, 497 F.2d 776 (8th Cir. 1974), *cert. denied*, 425 U.S. 937, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976); *Dairyland Power Co-op v. Federal Barge Lines, Inc.*, 414 F.Supp. 40 (E.D.Mo.1976), *aff'd mem.*, 553 F.2d 102 (8th Cir. 1977); *The Wyomissing*, 42 F.2d 666 (E.D.N.Y.1930). Moreover, neither the district court nor counsel for the parties have presented this court with such aids to interpretation, as legislative history, if any such aids exist.