UNITED STATES of America, Plaintiff-Appellee,

v.

NASSAU MARINE CORP., Central Marine Service and Canal Barge Company, et al., Defendants-Appellants.

No. 84–3551.

United States Court of Appeals, Fifth Circuit.

Dec. 19, 1985.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Edward J. Koehl, Jr., Robert T. Lemon, II, New Orleans, La., for defendants-appellants.

John P. Volz, U.S. Atty., William F. Baity, Asst. U.S. Atty., New Orleans, La., Thomas W. Osborne, Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before WISDOM, POLITZ, and TATE, Circuit Judges.

WISDOM, Circuit Judge.

The owners[1] of a sunken barge appeal from a judgment holding them responsible for removing the wreck under the Rivers and Harbors Act of 1899, ch. 425, 30 Stat. 1152 (codified as amended at 33 U.S.C. §§ 401 et seq.). We affirm the judgment of the district court.

### I.

The M/V CLARKE BERRY left Pensacola, Florida for Port Sulphur, Louisiana on the morning of March 23, 1979. It was pushing a single barge, the CBC–21, loaded with about 2,500 tons of molten sulphur. At about eight o'clock that evening, tow boat and barge were heading due west across lower Mobile Bay in fair weather. About two-thirds of the way across the Bay, the barge suddenly began to buckle amidship. The captain continued pushing the barge westward to clear the main north-south ship channel. Barge CBC–21 sank about 500 yards west of the north-south channel in twelve feet of water, with its mid-section resting on the bottom and its bow and stern out of the water. Investigations by the Navy, the Coast Guard, and the defendants failed to determine conclusively the cause of the buckling.

The defendants kept the wreck marked and lighted for four days and then abandoned it. The Coast Guard marked the wreck with a temporary buoy, and later erected a permanent marker with a flashing light.[2]

Barge CBC–21, built in 1960, was a steel-welded tank barge 280 feet long, 50 feet wide, and 12½ feet deep. About two weeks before it sank, the Avondale Shipyards repaired some cracks in the bow and stern sections of the barge. The district court found that the defendants failed to comply with a regulation requiring notification (which may be informal) of the repairs to the Coast Guard and Coast Guard inspection of the completed repairs.

The United States sued the defendants to recover the costs of marking the wreck. The government also sought an injunction requiring the owners to remove the wreck and a declaration that the defendants are liable for the costs of removal. The district court found the defendants liable under § 15.33 U.S.C. § 409, for negligently causing the barge to sink, and granted the injunction. *United States v. Nassau Marine Corp.*, E.D.La.1984, 577 F.Supp. 1475. The defendants appeal.

### II.

The United States presses the argument that vessel owners are strictly liable for the costs of removing sunken vessels from

---

**1.** Barge CBC–21 was owned by Nassau Marine Corporation, a wholly-owned subsidiary of Canal Barge Company. The M/V CLARKE BERRY is owned by Webster Marine Corporation, another wholly-owned subsidiary of Canal. Both Barge CBC–21 and the CLARKE BERRY were operated by Central Marine Service under a charter party with Canal. Canal and Central Marine have the same owners, officers, and directors.

**2.** The appellants satisfactorily removed the barge from Mobile Bay in December 1984.

navigable waters under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403.[3] As a matter of public policy, so the argument runs, the shipping industry should pay for any sinking creating an obstruction, even a non-negligent sinking; the industry is in the best position to decide how much to invest in efforts to prevent sinkings; the industry can insure itself almost as cheaply as can the government. Moreover, a strict liability rule would reduce the expense of litigation by eliminating the issue of negligence.

Our Court has held that a sunken vessel is an "obstruction" within the meaning of § 10 of the Act. *United States v. Raven*, 5 Cir.1974, 500 F.2d 728, 731, *cert. denied*, 1975, 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824; *United States v. Cargill, Inc.*, 5 Cir.1966, 367 F.2d 971, 975, *aff'd sub. nom. Wyandotte Transportation Co. v. United States*, 1967, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407.[4] Other circuits disagree reasoning that Congress intended sunken vessels to be governed solely by § 15. *See, e.g., United States v. Bethlehem Steel Corp.*, 9 Cir.1963, 319 F.2d 512, *cert. denied*, 1964, 375 U.S. 966, 84 S.Ct. 484, 11 L.Ed.2d 415.

Our Court has not decided whether § 10 imposes strict liability on those who create obstructions to the navigable capacity of United States waters. The language of the statute suggests liability without fault. In *University of Texas Medical Branch at Galveston v. United States*, 5 Cir.1977, 557 F.2d 438, 444, *cert. denied*, 1978, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111, the Court assumed that liability under § 10 is strict. "By its terms § 10 would prohibit even the innocent creation of such an obstruction." *Id.* at 444 n. 10.[5] The Eleventh Circuit has concluded that § 10 is a strict liability statute. *United States v. Baycon Industries*, 11 Cir.1984, 744 F.2d 1505, 1507.[6] The Third Circuit has reached the opposite result. *United States v. Ohio Barge Lines, Inc.*, 3 Cir.1979, 607 F.2d 624, 627–30.

We find it unnecessary to decide the applicability of § 10 to this case, because we agree with the district court's finding of liability under § 15. We are confirmed in this course by our recognition that the question raised by applying § 10 to wrecks are serious. First, a strict liability rule

---

**3.** Section 10 reads:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 403.

**4.** The *Cargill* case appears to have been brought because the government found the statutory remedies for violations of § 15 inadequate.

Sections 19 and 20 provide only for raising sunken vessels and selling them. Section 16 makes violations of § 15 punishable by a fine of $2,500 and a year's imprisonment. Section 12 in contrast authorizes injunctive relief for violations of § 10. The *Republic Steel* case extended the availability of injunctions under § 12 to obstructions other than "structures". *United States v. Republic Steel Corp.*, 1960, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903. The Supreme Court heard the *Cargill* case along with *Wyandotte*; *Wyandotte* solved the problem by implying a full range of remedies under § 15.

**5.** In that footnote the Court suggests that to hold shipowners strictly liable under § 10 for removing wrecks when only negligent shipowners are liable under § 15 would be "anomalous".

**6.** The *Baycon* opinion, however, holds that the government must prove that the defendant performed some act likely to cause the harm before the court will impose criminal liability under § 12 of the Act. *Id.* at 1507. The opinion expressly restricts the holding to criminal liability, however. *Id.*

might subject innocent owners to prosecution and imprisonment under § 16 of the Act, 33 U.S.C. § 411. Second, a Corps of Engineers' regulation provides that "the owner of a vessel which is sunk without fault on his part may abandon the wreck, in which case he cannot be held liable for removing it." 33 C.F.R. § 209.170(b). The government has made no effort to modify this regulation, although its position in this case is inconsistent with the regulation. Third, non-negligent shipowners may be entitled to limit their liability under 46 U.S.C. §§ 181–89. We have held that shipowners may not limit their liability if the vessel sank because of their negligence. *University of Texas Medical Branch at Galveston v. United States,* 557 F.2d at 452. If no one was negligent, however, *a fortiori* the owner was not in privity with a negligent party, nor did it have knowledge of any negligent act.[7]

### III.

The district judge held the defendants to have been negligent and therefore liable under § 15 of the Rivers and Harbors Act, 33 U.S.C. § 409. Section 15, part of the Wreck Act, makes shipowners liable for "voluntarily or carelessly" causing their vessels to sink in navigable channels.[8] "Carelessness" under § 15 is equivalent to negligence. *Nunley v. M/V Dauntless Colocotronis,* 5 Cir.1984, 727 F.2d 455, 458–60

(en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 120, 83 L.Ed.2d 63; *University of Texas Medical Branch at Galveston v. United States,* 577 F.2d at 444 n. 11.

Section 15 requires all owners, whether negligent or not, to warn other vessels by marking the wreck. Innocent shipowners may then abandon the wreck. If they do so, they have no obligation under § 15 to remove the wreck or to continue marking it as a hazard to navigation.[9] *Agri-Trans Corp. v. Gladders Barge Line, Inc.,* 5 Cir. 1983, 721 F.2d 1005; *Tennessee Valley Sand & Gravel Co. v. M/V Delta,* 5 Cir. 1979, 598 F.2d 930, 934, *modified,* 604 F.2d 13. If the government then raises the wreck, it is entitled to sell the vessel and its cargo. 33 U.S.C. §§ 414–15. The cost of removing the wreck nearly always exceeds its salvage value; otherwise the owner would not abandon it. At one time, shipowners' proctors argued that their clients were entitled to abandon a wreck under § 15 even if the owners were at fault. The Supreme Court held to the contrary in *Wyandotte Transportation Co. v. United States,* 1967, 389 U.S. 191, 206–07, 88 S.Ct. 379, 388, 19 L.Ed.2d 407.

The crucial issue under § 15, therefore, is whether the vessel owner's negligence caused the vessel to sink. The district court found that the defendants were negligent on the basis of the doctrine of *res*

---

**7.** The defendants suggest a fourth difficulty which need not detain us. They argue that the Louisiana district court lacked jurisdiction over the case, since the wreck lies off the coast of Alabama. *Republic Steel* and *Wyandotte* rights of action *in personam* under §§ 10 and 15, respectively. We find the defendants' contention that *in personam* actions must be brigaded with an *in rem* claim without merit.

**8.** Section 15 reads in part:
It shall not be lawful to ... voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels.... And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the ne-

glect or failure of the said owner to do so shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title. 33 U.S.C. § 409.

**9.** The Supreme Court concluded that §§ 15, 19 and 20 "were intended to protect the United States against liability for removing a sunken vessel if it chooses to do so." *Wyandotte Transp. Co. v. United States,* 1967, 389 U.S. 191, 207, 88 S.Ct. 379, 388, 19 L.Ed.2d 407. If so, Congress may not have intended to create any rights of vessel owners. The statute has not been so interpreted, however. *See Agri-Trans Corp. v. Gladders Barge Line,* 721 F.2d at 1005.

*ipsa loquitur* and the Rule of *The Pennsylvania,* 1874, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148, 577 F.Supp. at 1481. We review questions of negligence in admiralty cases under the clearly erroneous standard. *Canal Barge Co. v. China Ocean Shipping Co.,* 5 Cir.1985, 770 F.2d 1357. We conclude that the evidence supports a finding of negligence.

### A.

■ We have held that § 15 requires removal only if the wreck is an obstacle to navigation. *Agri-Trans Corp. v. Gladders Barge Line, Inc.,* 5 Cir.1983, 721 F.2d 1005, 1009–10. There is ample evidence to support the district court's finding that Barge CBC–21 is such an obstacle. Although the wreck does not threaten ships in the north-south deep draft ship channel, it does obstruct traffic on the east-west Gulf Intracoastal Waterway. One witness testified that the wreck lies at the maritime equivalent of "the intersection of 42nd Street and Fifth Avenue". Indeed, the buoys and markers erected by the Coast Guard were several times damaged or destroyed by passing vessels.

### B.

When a vessel sinks in calm weather, absent evidence that the crew was negligent, the vessel may be presumed to have been unseaworthy.[10] *See Commercial Molasses Corp. v. New York Tank Barge Corp.,* 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89; *Walker v. Harris,* 5 Cir.1964, 335 F.2d 185, *cert. denied,* 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342. The district court concluded that, on the facts of this case, such an event also raises an inference that the owner was negligent.

Unseaworthiness alone does not necessarily imply negligence.[11] The Supreme Court has held that liability for unseaworthiness "is essentially a species of liability without fault." *Seas Shipping Co. v. Sieracki,* 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. A vessel may become unseaworthy even though the owner, and indeed every person involved with the ship, was reasonably careful. *See* G. Gilmore & C. Black, *The Law of Admiralty* § 6–41, at 392–93 (2d ed. 1975). Indeed, the Carriage of Goods by Sea Act recognizes this distinction by requiring that the carrier shall use "due diligence" to make the ship seaworthy. *See* 46 U.S.C. § 1303(1)(a). If the ship becomes unseaworthy in spite of the carrier's exercise of due diligence, the carrier is not liable for loss of the goods. 46 U.S.C. § 1304.

The district court did not simply equate negligence and unseaworthiness. Rather, the court concluded that a particular set of facts concededly supporting an inference of unseaworthiness will also support an inference of negligence. The Supreme Court has said that the inference of unseaworthiness is merely "a particular application of the doctrine of *res ipsa loquitur,* which similarly is an aid to the plaintiff in sustaining the burden of proving breach of the duty of care ...". *Commercial Molasses Corp.,* 1941, 314 U.S. at 113, 62 S.Ct. at 162. In another admiralty context, the Supreme Court formulated a three-part test: *res ipsa loquitur* properly applies if: 1) the injured party was without fault; 2) the instrumentality causing the injury was un-

---

**10.** The Supreme Court has said that a sinking in fair weather in the absence of negligent handling warrants an inference of unseaworthiness, but does not compel that conclusion. *See Sweeney v. Erving,* 1913, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815. The distinction is unimportant here, since the district court drew the inference of negligence.

**11.** In *Grigsby v. Coastal Marine Service of Texas, Inc.,* 5 Cir.1969, 412 F.2d 1011, 1023–28, this Court held that nonnegligent unseaworthiness constitutes "fault" under Article 2315 of the Louisiana Civil Code. The *Grigsby* case relies in part on *Skovgaard v. The M/V Tungus,* 3 Cir. 1957, 252 F.2d 14, 17 (en banc), *aff'd,* 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524. In *The Tungus,* the Third Circuit held that unseaworthiness constitutes a "wrongful act, neglect, or default" under the New Jersey Wrongful Death Act. In this case, however, the language of § 15 prevents us from imposing liability on the basis of unseaworthiness alone. The statute imposes liability for "voluntary" or "careless" sinkings; a ship, of course, may become unseaworthy even though the owner is careful.

der the exclusive control of the defendant; and 3) the mishap is of a type that ordinarily does not occur in the absence of negligence. *Johnson v. United States,* 1948, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468; *see also* Restatement (Second) of Torts § 328 D. The defendants concede that the first two parts of the test are met, but contest the third.

To be sure, admiralty court sometimes infer negligence from the circumstances of the loss, as, for example, when a moving vessel allides with an anchored vessel or a fixed object, *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.,* 5 Cir. 1967, 377 F.2d 724, 726, or when a vessel breaks loose or drifts from its moorings, *see Isthmian Steamship Co. v. California Spray-Chemical Corp.,* 9 Cir.1961, 290 F.2d 486, 491, *modified,* 1962, 300 F.2d 41. With the possible exception of one district court case, *United States v. Chesapeake & Delaware Shipyard, Inc.,* D.Md.1974, 369 F.Supp. 714, 718–20, we have found no authority directly supporting the proposition that the sinking of a vessel in fair weather, without more, will support an inference of shipowner negligence. The inference is not unreasonable, however, that absent apparent operable negligence, a ship's sinking in fair weather is a result of defects in the structure or design of the vessel which the owner could have discovered by exercising due care. Here, the shipowner's failure to have repairs to Barge CBC–21 inspected by the Coast Guard adds weight to the district court's ultimate holding of negligence, notwithstanding its finding that "[e]vidence introduced at trial regarding the causal relationship between the uninspected repairs and the subsequent sinking of the barge was inconclusive". 577 F.Supp. at 1481.

### C.

█ Under the Rule of The *Pennsylvania,* a party who fails to observe a safety regulation has the burden of showing "not merely that [its] fault might not have been one of the causes [of the loss], or that it probably was not, but that it could not have been". 86 U.S. (19 Wall.) at 136. The Rule does not apply only to collisions. *Candies Towing Co., Inc. v. M/V B & C Eserman,* 5 Cir.1982, 673 F.2d 91, 93–94. Our Court has held that the Rule was not altered by the advent of comparative negligence in admiralty. *Allied Chemical Corp. v. Hess Tankship Co.,* 5 Cir.1981, 661 F.2d 1044, 1052.[12] The Rule has, however, been criticized as a "drastic and unusual presumption", and generally has been limited, at least in cases not involving collisions and allisions, to violations of statutes intended to prevent the injury that actually occurred. *Director General of India Supply Mission v. S.S. Maru,* 2 Cir.1972, 459 F.2d 1370, 1375; *see also* G. Gilmore & C. Black, *The Law of Admiralty* § 7–5, at 494 (2d ed. 1975). In this case, there is no doubt that the regulation was designed in part to prevent a sinking due to discoverable structural failure. The Rule is firmly established in this circuit, and we hold that the district court properly applied it in this case.

About two weeks before it sank, Barge CBC–21 and another barge owned by the defendants, the CBC–32, underwent repairs and maintenance at the Avondale Shipyards. The repairs to Barge CBC–21 were made to the bow and stern sections. Federal regulations require Coast Guard supervision and inspection of such repairs.[13] The district court found that the defendants failed to have the work inspected, thus

---

**12.** "The Second and Fifth Circuits have heralded the survival of the Pennsylvania Rule. The Ninth Circuit has concurred." Pitts, *Admiralty's Pennsylvania Rule,* 24 S.Tex.L.J. 541, 546 (1983). Judge John Brown has written: "The rule still floats, in the wake of *United States v. Reliable Transfer* [1975, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251]". 661 F.2d at 1052.

**13.** 46 C.F.R. § 30.01–10 provides, in part: "When minor alterations or minor repairs of tank vessels become necessary such work shall be under the direction of the Officer in Charge, Marine Inspection, and shall be in accordance with the regulations in effect at the time the vessel was contracted for or built, or in accordance with the regulations in effect for new construction insofar as possible".

bringing into play the *Pennsylvania* Rule. The government's proof rests in part on a Coast Guard logbook which shows no entry for Barge CBC–21 around the time of the repairs. The logbook did have an entry for the other barge owned by the defendants, the CBC–32. The entry for Barge CBC–32 was made after another entry in the same space was marked over so that the original entry became illegible. No witness admitted to marking over the original entry. Indeed, one Coast Guard witness testified that the standard procedure for changing a logbook entry is to strike a single line through it, and then to initial the strike-out.

A Coast Guard witness testified that Barge CBC–21 should have been inspected twice, once before the work began and again after the work was finished. Hence not one but two log entries are missing. Moreover, if the work had been inspected, the inspector should have filed a report with the Coast Guard Marine Inspection Office in New Orleans in addition to making the entries in the logbook. No report was found. Finally, a Coast Guard witness testified that the repairs did not meet Coast Guard specifications, and so would not have passed inspection. In the light of this evidence, we conclude that the trial judge could properly find that the repairs were not inspected as required by Coast Guard regulations.

We further conclude that the defendants did not carry the burden of showing that the violation could not have contributed to the loss. A naval architect testified that the cracks in the bow and stern were telltale signs that the hull had been strained amidship. The witness speculated that the barge may have been in an unreported collision. True, there was conflicting testimony that unloaded barges, riding high in the water, often run up on other barges or on docks, causing fractures in their plating. In either event, as the bow or stern rises out of the water, additional strain is placed on the mid-section of the hull. The Coast Guard inspector therefore might have decided to search for damage amidship on the basis of the fractures in the bow and stern. A Coast Guard witness testified that the inspector's task is to determine whether the vessel needs repairs in addition to those ordered by the owners. The witness described a procedure called "stepladdering", in which the inspector considers whether the damage already found could have been caused at the same time as other damage, and then looks for additional damage. We are persuaded that the Coast Guard inspector might have performed such an investigation.

A structural infirmity amidship is consistent with the facts relating to the barge's sinking and would have been detected by an inspection. The naval architect testified that if Barge CBC–21 had been structurally sound, it would not have buckled even if the sulphur tanks ruptured and leaked a large amount of sulphur amidship. The architect's testimony suggests that a structural defect amidship was at least a contributing cause of the sinking.

Considering the known facts and the fact that the mishap is of a type that ordinarily does not occur in the absence of negligence, as the district court found, the district court properly applied the doctrine of *res ipsa loquitur* and the *Pennsylvania* Rule which, at least in this circuit, has long been followed.

The judgment of the District Court is AFFIRMED.