**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**BAYCON INDUSTRIES, INC.,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**O/S INDUSTRIAL STATE, Defendant,**

**and**

**Benton & Company, Inc.,**
**Defendant-Appellant.**

**No. 86–3075.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 18, 1986.

---

David F. Pope, Tampa, Fla., for defendant-appellant.

Gary J. Takacs, Asst. U.S. Atty., Tampa, Fla., Damon C. Miller, U.S. Dept. of Justice, Torts Branch, Civil Div., Washington, D.C., for plaintiff-appellee.

Before GODBOLD and FAY, Circuit Judges, and ATKINS\*, Senior District Judge.

## CORRECTED OPINION

PER CURIAM:

The United States sued Baycon Industries, Inc. and Benton & Company under the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq.* (1983) seeking a declaratory judgment and injunctive relief requiring the owners[1] to remove the sunken

---

\* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. The sunken dredge, ALSATIA II, was owned at the time of the sinking by Baycon Industries.

The INDUSTRIAL STATE and JLD, tugs involved in towing the dredge when it sank were owned by Benton & Company. At the time of the sinking Baycon employees operated the tugs. Baycon Industries, Inc. is a wholly owned subsidiary of Benton & Company. Both compa-

dredge ALSATIA II. The United States District Court for the Middle District of Florida found the owners negligent under Section 15 of the Act and granted the injunction. The finding was based on the doctrine of *res ipsa loquitur*. The owners appeal from the judgment entered by the district court holding them jointly and severally liable for the removal of the sunken dredge. We affirm.

## I. BACKGROUND [2]

Baycon Industries, Inc. ("Baycon") was the owner of the dredge ALSATIA II which was approximately forty years old and had not been used since 1976. The ALSATIA II was moored at a Baycon facility in Bradenton, Florida where it was being held in storage. On August 21, 1981, the ALSATIA II was hooked up to the tug INDUSTRIAL STATE to be towed from Bradenton, Florida to Tampa, where it was to be examined by a prospective purchaser. The tow and barge were traveling on the main ship channel of Tampa Bay where the seas were calm. The weather was clear and the wind was two to three knots. At approximately 1:00 a.m. on August 22, the ALSATIA II began to take on water at a rapid rate. The water entered the barge faster than crewmen could pump it out and the barge began to sink. The tug captain, in an attempt to beach the tow, left the main ship channel and tried to get to shallow water. Halfway between the channel and the shore, however, the dredge sank in water approximately twelve feet deep. Though the hull of the dredge is submerged, twenty feet of superstructure and machinery remain above the water's surface. Neither party investigated the wreck to determine the cause of the sinking.

The marine superintendent employed by Baycon inspected the dredge before the voyage but admitted that he made no inspection of the external hull below the waterline. The testimony at trial revealed the marine superintendent had "no idea" regarding the condition of the outside below the waterline prior to the trip. The marine superintendent was aware that the dredge had been unused for approximately five years but limited his structural inspection to opening up the hatches to determine whether the inside was dry, looking into the holds with a flashlight to be sure "no light was shining through" and shutting all doors and hatch covers. The government contends that, under the theory of *res ipsa loquitur*, an inference of negligence regarding the sinking of the ALSATIA II is warranted from the facts.

The United States Army Corp of Engineers determined that the sunken dredge was a hazard to navigation and sent a "mark and remove" letter [3] to Baycon. Baycon initially planned and agreed to conduct salvage and removal operations itself, but was informed by consultants that the cost would be between $200,000 and $400,000. The high cost persuaded Baycon to abandon the vessel, despite the insistence of the Army Corp of Engineers that Baycon remove it. The barge remains today in the place it sank over four years ago.

## II. DISCUSSION

■ The only issue we address is whether the district court erred in applying the doctrine of *res ipsa loquitur* to find appellants negligent with regard to the sinking of the ALSATIA II under § 15 of the Riv-

---

nies have the same president, substantially the same board of directors and offices. We find that the mutual involvement in the tug operation and the inextricably intertwined relationship of the two corporate appellants support the district court's finding of joint and several liability for the removal of the sunken dredge. *See United States v. Nassau Marine Corp.*, 778 F.2d 1111, 1112 n. 1 (5th Cir.1985), where the court found the owners jointly and severally liable in a similar corporate scheme.

**2.** This civil action is a companion case to *United States v. Baycon Industries, Inc.*, 744 F.2d 1505 (11th Cir.1984), a criminal case arising out of the same facts.

**3.** The United States Army Corp of Engineers sent a "mark and remove" letter to advise shipowners of the law involved and their responsibility with respect to removing their vessel.

ers and Harbors Act of 1899.[4] We review a judgment of the district court, sitting without a jury in admiralty, under the clearly erroneous standard. *Harbor Tug & Barge, Inc. v. Belcher Towing Co.,* 733 F.2d 823, 825 (11th Cir.1984) (citing *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954)). We conclude that it was not clearly erroneous for the district court, under these facts, to apply the doctrine of *res ipsa loquitur.*

█ The obligations of the owner of a sunken dredge are defined by § 15 of the Rivers and Harbors Act of 1899.[5] Section 15 presents the critical issue of whether the vessel owner's negligence caused the vessel to sink.[6] *United States v. Nassau Marine Corp.,* 778 F.2d 1111, 1114 (5th Cir.1985). If it is determined the owner is negligent the government can avail itself of the statutory and implied remedies, including injunctive relief, declaratory judgment and money damages. *Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). The district court's finding that appellants were negligent was based on the doctrine of *res ipsa loquitur.*

A finding of negligence based on the doctrine of *res ipsa loquitur* in the admiralty context is not totally unique but neither is it routine. *See Johnson v. United States,* 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948); *United States v. Nassau Marine Corp.,* 778 F.2d 1111, 1115 (5th Cir. 1985). To determine whether the doctrine applies the Supreme Court in *Johnson* formulated a three-part test: *res ipsa loquitur* applies if: (1) the injured party was without fault, (2) the instrumentality causing the injury was under the exclusive control of the defendant, and (3) the mishap is of a type that ordinarily does not occur in the absence of negligence. *Johnson,* 333 U.S. 46, 68 S.Ct. 391; *Nassau Marine,* 778 F.2d at 1115–16 (citations omitted). Appellants concede that the first part of the test is met, but contest the second and third parts.

█ There is no contention that the government contributed in any way to the sinking of the dredge. Appellants argue that the instrumentality causing the dredge to sink was not within their exclusive control. They claim that to try to determine the instrumentality that caused the sinking would be sheer speculation. The district court concluded that the dredge itself was the "instrumentality" which must be in the exclusive control of the appellants in order

4. Appellants raise two other issues on appeal. We find it unnecessary to decide whether Section 10 of the Act, 33 U.S.C. § 403, imposes strict liability on shipowners, because we agree with the district court's finding of liability under Section 15, 33 U.S.C. § 409. Appellants also claimed that the district court erred in holding Baycon Industries and Benton & Company jointly and severally liable. We disagree. *See supra* note 1.

5. Section 15 states in pertinent part:
   It shall not be lawful ... to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels.... And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do

shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title. 33 U.S.C. § 409. "Voluntarily or carelessly" has been construed to include "intentionally and negligently." *Wyandotte Transp. Co. v. United States,* 389 U.S. 191, 207, 88 S.Ct. 379, 388, 19 L.Ed.2d 407 (1967); *University of Texas Medical Branch at Galveston v. United States,* 557 F.2d 438, 444 n. 11 (5th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978).

6. Non-negligent shipowners have a "right to abandonment" under Section 15 which absolves them from the obligation to remove the wreck. *United States v. Nassau Marine Corp.,* 778 F.2d 1111, 1114 (5th Cir.1985); *United States v. Baycon Industries, Inc.,* 744 F.2d 1505, 1508 (11th Cir.1984).

to satisfy the second prong of the *res ipsa loquitur* test. We agree.[7]

Appellants attempt to distinguish *Nassau Marine* by stating that the cause of the sinking of the vessel in that case was apparent; it buckled at its midships. We find no meaningful distinction, however, with a barge buckling at its midship and a dredge suddenly taking on an inordinate amount of water causing it to quickly sink. Appellants suggest that the government is required to show the cause of the sinking by the greater weight of the evidence in order to properly invoke the doctrine of *res ipsa loquitur*. Advancing appellants' argument that proof of cause is required would render the doctrine of *res ipsa loquitur* a nullity. The doctrine was formed to allow permissible inferences to be drawn from unexplained events. *Johnson*, 333 U.S. at 49, 68 S.Ct. at 393.

■ Finally, we agree with the district court that the sinking of the dredge in clear weather, absent any interference by another vessel, obstruction or debris is a mishap that ordinarily does not occur in the absence of negligence. The facts presented highlight no intervening cause of the sinking. The cursory inspection carried out by Baycon's marine superintendent did not include an assessment of the condition of the external hull below the water line. This dredge was forty years old and had not been used for five years. Preparing this tug for travel without checking the condition of the hull below the waterline and the subsequent sinking of the dredge in a matter of minutes on a clear and calm night clearly creates a permissible inference that the appellants were negligent. Seagoing vessels are built to float. Barges are constructed to float and to withstand the forces of being towed. Weather was not a factor. Rough water was not involved. There was no testimony concerning any abnormal incident which would have indicated any damage from a sunken obstacle or floating debris. Forty year old vessels deteriorate and no doubt require rather close and complete inspections after long periods of idleness. Under these circumstances a reasonable man could conclude that it is more likely than not that there was negligence associated with the sudden sinking of the dredge during this tow.

■ Once the inference of negligence was established, appellants had the burden of rebutting the inference. *Nassau Marine*, 577 F.Supp. 1475, 1482 (E.D.La.1984), *aff'd*, 778 F.2d 1111 (5th Cir.1985); *United States v. Chesapeake & Delaware Shipyard, Inc.*, 369 F.Supp. 714, 719 (D.Md. 1974). Appellants claimed that due care was taken in the preparation and operation of the dredge. The failure to check the external hull below the waterline is inconsistent with the exercise of due care in the maintenance and preparation of the dredge. Furthermore, appellants offered no feasible explanation for the unexplained sinking. We agree with the district court that appellants failed to rebut the inference of a lack of due care. *See Chesapeake & Delaware Shipyard*, 369 F.Supp. at 719.

■ The Rivers and Harbors Act of 1899 was enacted to protect the nations navigable waterways from obstructions. The Court in *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 201, 88 S.Ct. 379, 385, 19 L.Ed.2d 407 (1967), acknowledged that the government was a principal beneficiary of the Act. When an owner operates a dredge in navigable waters for his own commercial advantage and it sinks due to his negligence, there is no question that the responsibility of removing that vessel falls squarely on the owner. *See Id.* "To adopt a rule permitting owners whose negligence is not precluded by the facts to 'walk away' from their sunken crafts would confer on shipowners a substantial windfall, at the expense of those whose tax dollars create and maintain our public waterways." *United States v. Baycon Industries, Inc.*, 744 F.2d 1505, 1508 (11th Cir.1984).

## III. CONCLUSION

We hold that the district court correctly found appellants negligent under § 15 of

---

7. There is no question that the owners had control over the vessel. *See supra* note 1.

the Rivers and Harbors Act of 1899. We agree with the district court that *res ipsa loquitur* was the proper basis for this finding. For the foregoing reasons, the decision of the district court is AFFIRMED.